1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kevin Gunter
Pro Se Plaintiff
1714 Southern Ave
Fairbanks Ak, 99701
907-987-2202
gunter@spirit4all.org



OCT 3 0 2025

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

**KEVIN GUNTER,**
ON BEHALF OF HIMSELF, THE AD HOC
COMMITTEE OF TETLIN TRIBAL MEMBERS,
AND DISENFRANCHISED SHAREHOLDERS OF
THE TETLIN NATIVE CORPORATION.

       Plaintiff

CONTANGO ORE, INC.;
KINROSS GOLD CORPORATION;
ROYAL GOLD, INC.;
PEAK GOLD, INC.;
FAIRBANKS GOLD MINING, INC,;
AVALON DEVELOPMENT CORPORATION;
BLACK GOLD MINING, INC.;
BRADLEY J JUNEAU.;
RICK VAN NIEUWENHUYSE;
CURTIS J. FREEMAN;
YOUNG'S TIMBER, INC.;
JOSEPH A. YOUNG;
KRISTIE CHARLEY (YOUNG);
MICHAEL SAM;
RICKEY WILLIAM HENDRY;
JOHN DOES 1-10.

       Defendant

Case No.:

3:25-cv-00307-SLG

COMPLAINT TO QUIET TITLE AND
FOR
EQUITABLE RELIEF.

PLAINTIFF KEVIN GUNTER, ON
BEHALF OF HIMSELF AND AS
SPOKESPERSON FOR THE AD HOC
COMMITTEE OF TETLIN TRIBAL
MEMBERS, AND
DISENFRANCHISED
SHAREHOLDERS OF THE TETLIN
NATIVE CORPORATION
RESPECTFULLY SUBMITS THIS
COMPLAINT.

DATED: ___10/30___, 2025.

*Kevin M Gunter*
KEVIN GUNTER
PRO SE PLAINTIFF

1

## Contents

I. Introduction and Summary of Claims...................................................................2

II. Jurisdiction and Venue...................................................................................4

III. Parties.....................................................................................................6

V. Conflicts of Interest and Fiduciary Breaches by State Officials.........................31

VI. Absence of Tetlin Tribal Council as Indispensable Party: ................................33

VII. Claim for Relief – Quiet Title: ....................................................................35

VIII. Prayer for Relief......................................................................................37

IX. Violations of U.S. Treaties, Federal Statutes, and International Agreements: .................68

## I. Introduction and Summary of Claims

This action seeks to restore and protect the rightful ownership and stewardship of the lands of the Native Village of Tetlin in Alaska. **Plaintiff Kevin Gunter** – a member of the Tetlin tribal community and a shareholder of the Tetlin Native Corporation ("TNC") – brings this complaint to challenge a decades-long scheme by which certain Tetlin leaders and various corporate actors unlawfully transferred, leased, and exploited approximately 740,000 acres of Tetlin's ancestral lands for personal gain. The focus of this complaint is on the private corporations and individuals who benefited from these transactions – a web of mining companies and their associates – and it asserts claims under federal law (with related state-law claims under the Court's supplemental jurisdiction) to void the improper conveyances, recover misappropriated assets, and return the lands and benefits to the Tetlin people. (All references to actions of State of Alaska officials or state-specific law are limited, as this case rests primarily on federal question jurisdiction – particularly issues arising under the Alaska Native Claims

2

Settlement Act ("ANCSA") – along with supplemental jurisdiction over attendant common-law claims.)

In summary, a former Tetlin tribal chief, acting without authorization and in breach of his fiduciary duties, deeded hundreds of thousands of acres of TNC land to the Tetlin Tribal Council in 1996 without any shareholder approval. Subsequently, in 2008, that same individual secretly executed a mineral lease granting nearly exclusive mining rights over these lands to an outside venture, in exchange for personal consultant payments and other kickbacks. Over the years, this "Peak Gold" mining venture – now involving Defendants Contango ORE, Inc., Kinross Gold Corporation, and others – has profited from Tetlin's land through subleases and joint ventures, all predicated on the invalid 1996 transfer and 2008 lease. The Tetlin people, by contrast, received only minimal royalties (on the order of 3–5%), while certain insiders received secret payments, profit interests, and other improper benefits. Through this action, Plaintiff seeks to have the 1996 transfer, and 2008 (and subsequent) leases declared void *ab initio*, to quiet title in the affected Tetlin lands back to TNC, to rescind the unauthorized mining agreements, and to recover assets and profits unjustly diverted from the Tetlin community. Plaintiff further seeks the appointment of an independent trustee or receiver to ensure that these lands (and any proceeds derived from them) are managed going forward for the benefit of the Tetlin Native Corporation shareholders, and Tetlin tribal members, free from the self-dealing that has plagued them to date.

3

**Plaintiff's Notice Regarding Pro Se Status:**

Kevin Gunter respectfully requests the Court's consideration of his pro se status and asks for reasonable flexibility in procedural matters consistent with constitutional protections under the Fifth and Fourteenth Amendments, and federal guidance (Haines v. Kerner, 404 U.S. 519, 520 (1972) that pro se litigants receive liberal construction of pleadings. Plaintiff respectfully submits that rigid enforcement of minor procedural formatting rules would unnecessarily impede meaningful and fair access to the courts, thereby infringing upon Plaintiff's fundamental rights protected by the 14th Amendment of the Constitution.

## II. Jurisdiction and Venue
### a) Federal Question (28 U.S.C. § 1331):

This Court has original jurisdiction over this action because Plaintiff's claims arise under federal law. In particular, the case requires interpretation and application of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.*, and implicates other federal statutes governing Native American rights and lands. Plaintiff seeks relief under federal law to void actions that contravene ANCSA's provisions and federal policy, and to vindicate rights protected by the Indian Civil Rights Act of 1968 (ICRA, 25 U.S.C. §§ 1301–1304) and principles of the Indian Self-Determination and Education Assistance Act (ISDEAA, 25 U.S.C. § 5301 *et seq.*). The 1996 land transfer and subsequent dealings violated federal law and policy under ANCSA (as later recognized by the Alaska Supreme Court in *Jimerson v. Tetlin Native Corp.*, 144 P.3d 470 (Alaska 2006), thus presenting a substantial federal question. Moreover, the dispute centers on the ownership and status of Native lands established by ANCSA (a federal statute); resolving

4

the parties' rights in those lands calls for the application of federal common law, including

federal trust principles and fiduciary obligations owed to Native peoples.

**b) Supplemental Jurisdiction (28 U.S.C. § 1367):**

To the extent any claims (for example, fraud, breach of fiduciary duty, or unjust

enrichment) arise under state law or Alaska Native common law, this Court has supplemental

jurisdiction over them because they form part of the same case or controversy as the federal

claims. All of the claims derive from a common nucleus of operative facts concerning the

unlawful transfer and exploitation of Tetlin's lands and thus are appropriately heard together.

**c) Venue (28 U.S.C. § 1391(b)):**

Venue is proper in the District of Alaska because the property that is the subject of this

action is located in this District, and a substantial part of the events or omissions giving rise to

the claims occurred in Alaska. The Tetlin lands at issue (and the related mineral activities) are in

interior Alaska near the Village of Tetlin, within this Court's jurisdiction. Critical events –

including the execution of the 1996 quitclaim deed in Tetlin, the secret 2008 mineral lease

arranged in Tetlin, and the ongoing mining and exploration activities on Tetlin lands – all took

place in Alaska. Furthermore, many Defendants reside in or conduct significant business in

Alaska (for example, the "Peak Gold" mining project is located in this District, and Kinross

Gold's relevant subsidiary operates out of Fairbanks, Alaska).

**d) No Tribal Immunity Barrier:**

The only sovereign entity potentially implicated by these claims—the Tetlin Tribal

Council—is not named as a defendant in this action. Plaintiff explicitly disputes the legitimacy

of this entity's authority due to unauthorized and unlawful governance and election procedure

changes made in 2019. These unauthorized changes resulted in the establishment of an

5

illegitimate governing body, effectively operating as a proxy government without proper tribal authorization. Thus, Plaintiff seeks no relief against the legitimate Council itself, only against private corporate entities and individuals who acted outside the scope of any lawful tribal authority. Consequently, tribal sovereign immunity presents no bar to this Court's adjudication of the federal claims. Actions undertaken by purported Tribal Council officials involved in this dispute are alleged to have been ultra vires—beyond the scope of lawful authority and in violation of federal law—and thus their validity can be determined by this Court without requiring the Tribe or its illegitimately formed proxy council to be a party.

**e) Assertion of Federal Jurisdiction and Continuing Violations:**

Plaintiff explicitly asserts federal jurisdiction pursuant to ANCSA, relevant federal statutes, and fiduciary duties established under federal Indian law, explicitly emphasizing that each unauthorized action and trespass by Defendants constitutes a distinct, continuing violation and ongoing harm, citing precedent including Oneida Indian Nation v. County of Oneida to reinforce the continuous nature of these breaches, explicitly overcoming any potential statutes-of-limitations defenses.

**III. Parties**

**a) Plaintiff. Kevin Gunter** is a federally recognized member of the Native Village of Tetlin and a shareholder of Tetlin Native Corporation. He brings this action (a) on his own behalf as a tribal member whose property rights, subsistence use of the land, and fundamental rights (including due process and equal protection under the U.S. Constitution) have been directly harmed by Defendants' unauthorized actions; (b) as a shareholder of TNC whose financial and governance rights have been injured by the Defendants' breaches of fiduciary duty, self-dealing, and

unlawful transactions; and (c) as the spokesperson and authorized representative of an ad hoc committee of Tetlin tribal members, a group of similarly situated community members who have collectively suffered harm from the wrongful acts described herein. At this pleading stage, only essential facts regarding the parties are provided, and Plaintiff notes that further details about each party's conduct and involvement will be developed through discovery. Plaintiff Kevin Gunter explicitly asserts inherent tribal sovereign immunity protections as a member and representative of the Native Village of Tetlin. Plaintiff explicitly declares that all actions described in this complaint are taken clearly within the lawful scope of representation, advocacy, and protection of inherent tribal sovereignty, tribal lands, and constitutional rights. Sovereign immunity is not sought here as relief from this Court but rather explicitly asserted as an inherent right under established federal law, clearly protected under federal statutes and judicial precedents including *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), and *Lewis v. Clarke*, 137 S. Ct. 1285 (2017). Plaintiff explicitly preserves and asserts this sovereign immunity protection to clearly prevent any retaliatory legal actions against Plaintiff personally or in a representative capacity, explicitly reinforcing Plaintiff's rights and protections throughout these proceedings.

**b) Tetlin Native Corporation ("TNC").** TNC is an Alaska Native village corporation organized under ANCSA in 1973, with its principal place of business in Tetlin, Alaska. Upon its creation, TNC received patents to approximately 743,000 acres of surface and subsurface estate in and around Tetlin (land formerly part of the Tetlin Indian Reserve), to be managed for the benefit of its Alaska Native shareholders (who are also members of the Tetlin Tribe). TNC is a nominal defendant in this action, named to ensure complete relief (particularly for the quiet title claim to confirm TNC's ownership of the land). TNC itself was a victim of the wrongful land transfers

7

and corporate misconduct described in this complaint. To be clear, any allegations of "wrongdoing" attributed to TNC refer to actions of certain of its officers or directors acting *ultra vires* (beyond the scope of their lawful authority) and not to the corporation or its shareholders as a whole. Plaintiff's interests are aligned with TNC's true interests: the goal is to restore TNC's rightful land ownership and to protect TNC (and its shareholders) from further unauthorized acts.

**c) Contango ORE, Inc. ("Contango").** Contango is a publicly traded Delaware corporation registered to do business in Alaska. It is a major participant in mining and mineral exploration in Alaska, and specifically has been involved in developing and exploiting the mineral resources on Tetlin lands. Contango holds a 30% ownership interest in Peak Gold, LLC, a joint venture formed with Kinross Gold Corporation (through Kinross's subsidiary, Fairbanks Gold Mining, Inc.) for the purpose of exploiting the Tetlin mineral deposits under the invalid 2008 lease and related agreements. Contango has materially benefited from the mining rights in Tetlin lands despite knowing of serious defects in the title. Indeed, Contango's own SEC filings (e.g., in annual reports on Form 10-K) acknowledged the significant title risks affecting the project; nevertheless, Contango proceeded with the venture, directly contributing to the harm suffered by Plaintiff and the Tetlin community.

**d) Kinross Gold Corporation ("Kinross").** Kinross is a Canadian corporation and one of the world's largest gold producers. Through its subsidiaries (including Fairbanks Gold Mining, Inc.), Kinross acquired a majority interest in the Tetlin "Peak Gold" project. By around 2020, Kinross (via a subsidiary) purchased or assumed a 70% interest in Peak Gold, LLC – acquiring stakes originally held by Contango and Royal Gold – and became the principal operator of the project. Kinross, acting through Fairbanks Gold Mining, Inc., has coordinated and managed the extraction, transportation, and processing of ore taken from Tetlin lands (for example,

8

transporting ore by truck to Kinross's mill in Fort Knox, Alaska). Kinross has profited enormously from the venture while relying on the void 1996 deed and 2008 lease for its activities. Kinross's involvement includes financing project infrastructure and providing equipment (such as a fleet of ore-hauling trucks), all while on notice that the underlying land conveyances and lease were of dubious legality.

**e) Peak Gold, LLC.** Peak Gold, LLC is a joint venture entity (formed by Contango and Royal Gold, now majority-owned by Kinross) through which the mining project on Tetlin lands is structured. Peak Gold, LLC holds itself out as having leasehold or mineral rights to the Tetlin lands by virtue of the 2008 mineral lease and subsequent agreements. Its operations are based in this District (near Tetlin and Fairbanks). Peak Gold, LLC is named as a defendant to ensure that any claimed interest it asserts in Tetlin lands can be adjudicated and extinguished as necessary. Peak Gold, LLC has acted in concert with the other corporate defendants in exploiting the mineral resources on the lands in question.

**f) Fairbanks Gold Mining, Inc.** Fairbanks Gold Mining, Inc. is a Delaware corporation and a wholly owned subsidiary of Kinross Gold Corporation. It operates Kinross's Fort Knox gold mine and mill north of Fairbanks, Alaska, and has been directly involved in the Tetlin project by processing ore hauled from Tetlin lands. Fairbanks Gold Mining, Inc. is a participant in Peak Gold, LLC and is a key vehicle through which Kinross executes the mining and transportation activities at the heart of this dispute.

**g) Royal Gold, Inc.** Royal Gold is a Delaware corporation that invests in mining projects (often through royalties or streaming agreements). Royal Gold was an early financier/partner in the Tetlin project and thereby benefited from the unauthorized exploitation of Tetlin's resources. For example, Royal Gold helped fund the project's development via a "Stability Agreement" in

9

2014, ensuring that it would receive royalty or investment returns from any gold produced. Royal Gold continued to accept royalties or other benefits from minerals extracted under an invalid lease, making the company complicit in the violation of ANCSA's requirements and the rights of the Tetlin people.

**h) Avalon Development Corporation.** Avalon is an Alaska corporation (based in Fairbanks) specializing in mineral exploration services. Upon information and belief, Avalon (headed by Defendant Curtis J. Freeman) was hired in the early stages of the Tetlin project (around the mid-2000s) to conduct exploration activities on Tetlin lands. Avalon's work helped identify valuable mineral deposits, and it thereby facilitated the mining venture. Avalon and Mr. Freeman are included as defendants due to their participation in and benefit from the exploration and development done under unlawful land agreements (Avalon was paid for exploration of lands that had been transferred or leased without proper authority).

**i) Black Gold Express, Inc.** Black Gold Express is an Alaska corporation involved in transportation (notably trucking services). It has been a contractor in the Tetlin project, providing ore hauling or related transport operations under the moniker "Black Gold Transport." Black Gold Express, believed to be controlled by or closely associated with Kinross's operations, is responsible for the dedicated fleet of trucks transporting gold ore from Tetlin to the Fort Knox mill. Black Gold Express is named as a defendant to address its role in the ongoing removal of resources from the disputed lands and to ensure that appropriate injunctive relief (halting further transport of ore) can be enforced against it.

**j) Bradley J. Juneau.** Brad Juneau is an individual who has played a key role in the mining venture. He initially facilitated the exploration and leasing of Tetlin lands through a private entity informally known as Juneau Exploration ("JEX"), which was involved in securing the

10

early mineral rights deals. Juneau personally profited by transferring lease interests (or mining agreements) to Contango's predecessor and later serving as CEO of Contango ORE, Inc. during critical periods of the project's development. Juneau thus acted at various times as both a principal in the leasing scheme and an officer of Contango. He is sued for his personal role in orchestrating the unauthorized mineral agreements and for unjust enrichment (including any proceeds he obtained from selling or assigning Tetlin lease interests to Contango).

**k) Rick Van Nieuwenhuyse.** Rick Van Nieuwenhuyse is an individual with a prominent history in Alaska's mining industry (previously involved in projects such as NovaGold's Donlin Gold and the Ambler mining district). He is currently the President and CEO of Contango ORE, Inc. Van Nieuwenhuyse took leadership of the "Peak Gold" project (also known as the Manh Choh project) and oversaw its development and financing, including securing investments from state entities like the Alaska Future Fund. Given his extensive experience, Van Nieuwenhuyse knew or should have known of the importance of clear land title and community consent when operating on Indigenous lands. By continuing exploration and development under a clouded title – and by engaging in financial arrangements that potentially entangled public investment funds in a disputed project – Van Nieuwenhuyse breached ethical and legal duties. He is liable for aiding and abetting the fraudulent scheme and must account for the benefits obtained under his stewardship. Any background involving state influence or regulatory facilitation is addressed solely for context and not as a direct claim against state officials.

**l) Curtis J. Freeman.** Curtis Freeman is a geologist and the principal of Avalon Development Corporation. He personally oversaw Avalon's exploration program on Tetlin lands. Freeman's work was instrumental in advancing the project, and he had direct knowledge of the circumstances under which Avalon was given access to the land. Freeman had professional and

11

ethical obligations given that Indigenous land rights were at issue; by proceeding with exploration "under the radar" of the Tetlin community, he contributed to the concealment of the scheme. Freeman is therefore named for aiding and abetting the wrongful conduct and any breaches of fiduciary duty related to the exploration phase.

**m) Young's Timber, Inc.** Young's Timber is an Alaska corporation ostensibly in the business of timber harvesting and land management, owned and controlled by Defendant Joseph A. Young. In practice, Young's Timber became a vehicle for Joseph Young to profit from the Tetlin land deals: it was awarded lucrative service contracts related to the mining project (such as land clearing, road construction, transport, and logistical support) as part of the secret arrangements tied to the 2008 lease. Young's Timber received these contracts not through open or fair competition, but due to the influence of Joseph Young and his associates within Tetlin's leadership. The company's role was integral to the self-dealing scheme – it directly benefited from contracts that were essentially kickbacks for facilitating the unauthorized mineral lease. Young's Timber is sued for participating in the fraudulent scheme and to ensure that any ill-gotten gains it obtained (through contracts or subleases on Tetlin land) can be recovered.

**n) Joseph A. Young.** Joseph "Joe" Young is an adult individual who has been residing unlawfully and without legitimate authorization on Tetlin lands. He is the owner of Young's Timber, Inc. Joseph Young was in a position of trust in the Tetlin community with his daughters, but exploited that trust to enrich himself and his family. He was a key architect and beneficiary of the unlawful land transactions: working behind the scenes, he helped arrange the 2008 mineral lease to Contango and ensured that his company (Young's Timber) received subcontracts and a sublease interest in the project, all without disclosing his personal stake. Joseph Young's actions constituted blatant fraud and self-dealing in violation of the fiduciary duties he owed to TNC's

12

shareholders and the Tribe. He is named as a defendant for his central role in these events and to impose accountability for the damage done to the community. *(Any assets held by Joseph Young that derive from this scheme, including assets placed in the names of family members such as his daughter Kristie, are subject to restitution and equitable remedies sought herein.)*

**o) Kristie Charley (Young).** Kristie Charley (maiden name Kristie Young) is an enrolled Tetlin tribal member and the daughter of Defendant Joseph A. Young. During the relevant period, Kristie held positions of authority in Tetlin's governance – she served in administrative or leadership roles within the Tetlin Tribal Council (and possibly in TNC's management). Kristie Charley actively participated in arranging the 2008 mineral lease between the Tribal Council and Contango, while intentionally concealing her involvement from the community. Although her name does not appear as a signatory on the lease, she orchestrated the deal and simultaneously saw to it that exploration and service contracts were awarded to Young's Timber, Inc. (her father's company) at the time of the lease signing. In other words, Kristie helped set up the Contango lease and immediately profited from it indirectly by diverting work (and income) to her family's company. This hidden arrangement was a fraudulent conflict of interest: those negotiating the lease (Kristie and Joseph Young) had a secret financial stake in its outcome, which they did not disclose to TNC's shareholders or the Tetlin tribal members. Kristie later cemented her control by rewriting tribal governance ordinances in 2019 – changes that significantly restricted voting rights of tribal members and centralized authority within the Council. These 2019 governance changes, made without proper community approval, effectively marginalized a large portion of the Tetlin Tribe (many members were stripped of voting privileges) and ensured that the Young family's contracts and the mining agreements would not be challenged internally. Kristie Charley is sued for breach of her fiduciary duties to the Tribe

13

and TNC's shareholders, for fraudulent self-dealing and concealment, and for aiding and abetting the misuse of Tetlin's assets (through unauthorized leases, subleases, and oppressive governance actions).

**p) Michael Sam.** Michael Sam is the current acting Chief of the Tetlin Tribal Council (Native Village of Tetlin). He assumed leadership after the late Chief Donald Adams passed away around 2015. *(Michael Sam is named here in his individual capacity only; he is not sued as the Tribal Chief per se, in recognition of the Tetlin Tribal Council's sovereign immunity. To the extent Chief Sam engaged in ultra vires or self-dealing conduct outside the scope of any lawful official capacity, he can be held individually liable, and such conduct would not be protected by sovereign immunity.)* Initially, Chief Sam was an opponent of the mining project, but his stance later shifted to support the venture. It is alleged that he – or other Tribal Council members – may have received undisclosed compensation or benefits from Kinross or its partners in exchange for the Council's continued acquiescence to the 2008 lease and subsequent agreements. For example, under Chief Sam's watch, a 2014 extension or re-authorization of the mineral lease ("Manh Choh" project lease) was signed without proper procedural compliance or community approval. Sam's actions in signing or facilitating this lease extension violated his fiduciary duties to the Tribe by disposing of tribal assets and compromising Tetlin's sovereign land rights without due authorization. Additionally, Michael Sam has been employed as a heavy equipment operator for a contractor on the Manh Choh project – a clear conflict of interest between his duty to protect the tribe's interests and his personal financial benefit from the mining. Under Sam's leadership, nearly $10 million in federal grants and contracts passed through the Tribal Council with minimal transparency or audit, leading to concerns of mismanagement of tribal resources. His tenure has been marked by suppression of dissent among tribal members and obstruction of

14

transparency (for instance, refusing to share information or hold fair elections). Michael Sam is named as a defendant (along with "John Doe" tribal officials, as indicated by "et al." in the caption) solely to pursue individual accountability if it is proven that he personally profited from any side agreements, kickbacks, or fraudulent activities related to the mining project. If discovery shows that Chief Sam or others received illicit payments (cash, consulting contracts, hiring of relatives, etc.) from the corporate Defendants in exchange for their cooperation, those individuals will be liable for fraud, breach of fiduciary duty to the Tribe, and unjust enrichment. By naming him in this complaint, Plaintiff puts Michael Sam on notice that any such personal enrichment at the Tribe's expense is being targeted, while recognizing that official-capacity claims against him are barred by sovereign immunity.

**q) Rickey William Hendry** is an individual residing in Apple Springs, Texas. Hendry facilitated introductions between Tetlin leadership and outside investors, notably Brad Juneau (Juneau Exploration) and Richard Levens (RL Investment), through a Finder's Fee Agreement executed with the Native Village of Tetlin. Under this agreement, Hendry explicitly secured a financial stake (10% of net profits) derived from resource extraction and exploration activities on Tetlin lands, tied directly to the unauthorized transactions and leases central to this complaint. Hendry's involvement materially contributed to initiating and advancing the fraudulent and unauthorized land dealings, thus implicating him directly in the breaches of fiduciary duty, unjust enrichment, and other wrongdoing described herein.

**r) John Does 1–10.** These placeholder defendants represent additional individuals or entities currently unknown to Plaintiff who were involved in the wrongful conduct described herein – such as other Tribal Council members, corporate agents, or third-party conspirators. Should discovery reveal their identities and involvement, Plaintiff will seek to amend the complaint to

15

add them as defendants. *(In the original caption, "et al." was used to encompass such unknown parties, and they are here identified as John Does 1–10 for clarity.)*

## IV. Factual Background and Allegations:

**a) Historical Context and Foundation.** The lands at the heart of this dispute have always been the homeland of the Tetlin Athabascan people. On June 10, 1930, President Herbert Hoover issued Executive Order 5365, setting aside approximately 786,000 acres as the Tetlin Indian Reserve for the exclusive use and benefit of the Native Village of Tetlin. The purpose of creating the Tetlin Reserve was to protect the Tetlin people's traditional territory, ensuring that the land would continue to support their subsistence lifestyle, culture, and community needs. This federal Reserve acknowledged the Tetlin Natives' deep connection to the land and was intended to safeguard their rights to that land against encroachment.

In 1971, the legal landscape for Alaska Native lands changed with the passage of the.

**b) Alaska Native Claims Settlement Act (ANCSA)** on December 18, 1971. ANCSA extinguished aboriginal land claims in Alaska in exchange for, among other things, granting Alaska Natives title to 44 million acres of land and providing nearly $1 billion in compensation, to be managed through newly formed Native regional and village corporations. Pursuant to ANCSA, the Native Village of Tetlin incorporated Tetlin Native Corporation (TNC) in 1973 as its ANCSA village corporation. Approximately 743,147 acres of the former Tetlin Reserve lands were patented to TNC (surface and subsurface estate) for the benefit of Tetlin's Alaska Native shareholders (who are also members of the Tetlin Tribe). ANCSA imposed clear requirements and restrictions on how these Native corporation lands can be managed or conveyed. In particular, ANCSA and TNC's own corporate governance rules require that any significant

16

transfer or encumbrance of TNC's lands must have the consent of the corporation's shareholders. TNC's directors and officers also owe fiduciary duties to act in the best interests of the Native shareholders when managing the lands and assets. The importance of these protections has been affirmed by case law, including *Jimerson v. Tetlin Native Corp.*, 144 P.3d 470 (Alaska 2006), in which the Alaska Supreme Court underscored that transactions affecting ANCSA lands are invalid absent strict adherence to shareholder-approval requirements and fiduciary duty standards. In short, as of the early 1970s, Tetlin's lands were held by TNC under federal patent with the understanding that those lands would not be sold, transferred, or encumbered without broad community consent and full transparency.

**c) Key Events and Transactions (1996–Present).** In **1996**, approximately 643,174 acres of TNC's ANCSA-patented land (nearly the entirety of Tetlin's land base) were transferred via a quitclaim deed from Tetlin Native Corporation to the Tetlin Tribal Council for a nominal sum of $10. This transfer was executed unilaterally by TNC's leadership at the time, without seeking or obtaining the required approval of TNC's shareholders. Under ANCSA and TNC's bylaws, any transfer of substantially all of the corporation's land assets required a resolution approved by an affirmative vote of the Native shareholders. No such shareholder vote or consent was ever sought or obtained for the 1996 transfer. The deed was therefore an unauthorized act by TNC's officers/directors and a grave breach of their fiduciary duties to the shareholders. In particular, the transfer directly violated ANCSA's statutory safeguards – for example, the requirement (under 43 U.S.C. § 1629) that shareholder consent be obtained for any sale or disposition of virtually all corporation lands. There is no evidence (documentary or otherwise) that the necessary shareholder consent was ever given. In *Jimerson v. Tetlin Native Corp.* (2006), the Alaska Supreme Court addressed this very transaction and confirmed that it violated ANCSA's

17

protections for shareholders. The practical effect of the 1996 quitclaim deed was to cloud the title to Tetlin's lands by placing record title in the Tribal Council's name without legal authority, thereby creating confusion and conflict over ownership and control of the land.

**d) Immediate Harm to TNC – Loss of Land and Assets:** As a result of the 1996 unauthorized deed, Tetlin Native Corporation was divested of its primary asset (its land) on paper. This crippled TNC's financial base and ability to function for its shareholders. Indeed, Defendants' unauthorized and fraudulent transactions – beginning with the 1996 deed and later compounded by the 2008 lease and various subleases – have severely damaged TNC's finances, to the point that the corporation has been unable to afford independent legal representation or effectively challenge these unlawful actions on its own. Stripped of its land (and the income or opportunities that land represents), TNC lacks the resources it would normally use to file suit or defend its interests. This fact underscores the need for court intervention: interim relief (such as a court-appointed trustee or receiver) is urgently required to protect TNC's rights and to give the Tetlin community a fair opportunity to reverse the damage. In short, by wrongfully alienating TNC's land and revenues, the perpetrators of the 1996–2008 scheme effectively silenced the corporation and left it financially incapable of seeking justice without the aid of individual shareholders like Plaintiff.

In **2008**, a **Mineral Lease** was executed between the Tetlin Tribal Council and **Juneau Exploration (JEX)** covering virtually all of the lands conveyed by the invalid 1996 deed. This lease granted Contango and its partners extensive rights to explore and extract minerals from the Tetlin lands for a lengthy term (and possibly renewable terms), on terms highly unfavorable to Tetlin. The lease was arranged and signed in secret, without notice to or approval from the TNC shareholders or the broader Tetlin tribal community. Critically, a substantial conflict of interest

18

was concealed in this transaction: **Kristie Charley (Young)**, the daughter of Joseph Young and a Tetlin tribal official, was heavily involved in negotiating and facilitating the lease while hiding her participation. At the very same time the lease was signed, service contracts related to exploration were awarded to Young's Timber, Inc., Joseph Young's company. In effect, Kristie helped set up the leasing of Tetlin's mineral rights to an outside corporation and ensured that her family (through Young's Timber) immediately profited from that lease. Neither Kristie nor Joseph Young disclosed to the Tribe or TNC that they would benefit financially from the lease. The 2008 lease terms themselves reflect the one-sided nature of the deal: Tetlin (through the Tribal Council) received only a small royalty (approximately 3%–5%) and some minor annual payments, whereas Contango and its investors stood to gain the vast majority of the mining profits and control. The lease also gave the company broad control over surface use, with minimal oversight. In sum, the 2008 mineral lease was procured by fraud and breach of trust – it was unauthorized (since the land never validly belonged to the Council to lease out), it was *ultra vires* (the Council's own rules did not allow such a transaction without community consent), and it was tainted by self-dealing (the Young family's secret financial stake).

**e) Subsequent Joint Ventures and Assignments:** Following the 2008 lease, Contango and its partners formed **Peak Gold, LLC** to jointly develop the Tetlin mining project (often referred to as the "Manh Choh" project). Over time, Contango sold or farmed out portions of its interest: Kinross Gold Corporation ultimately acquired a majority stake in the project (around 70%) and became the operator, and Royal Gold, Inc. also obtained a royalty interest or investment share. These Defendants all entered the venture with knowledge – or at least notice – that the underlying land title was in question (for example, Contango's public filings explicitly noted it

19

lacked a "clear mineral lease" from TNC, acknowledging the title problem stemming from TNC's patent).

*"Contango's 2011 Form 10-K, filed with the U.S. Securities and Exchange Commission, explicitly states: 'With respect to our Tetlin Lease, we retained title lawyers to conduct a general examination of title to the mineral interest prior to executing the lease... However, such deficiencies may not be cured by us. It does happen, from time to time, that the examination made by title lawyers reveals that the title to properties is defective, having been obtained in error from a person who is not the rightful owner of the mineral interest desired."*

This public disclosure demonstrates that Contango proceeded with exploration and development despite actual notice that the underlying land title was likely defective. Nonetheless, each corporate Defendant chose to proceed, effectively betting that the Tetlin people would not or could not challenge the arrangements. Each Defendant played a specific role in this interlocking scheme that has unlawfully stripped the Tetlin tribal community of control over its lands: from internal fiduciary breaches by TNC's own leaders, to external exploitation by mining companies, to state officials smoothing the path for these dealings (e.g., by approving permits despite obvious title issues), the factual pattern reveals a concerted disregard for the legal safeguards protecting Tetlin's land.

In **2014**, as the project progressed, an agreement often called a **"Stability Agreement"** was executed, likely extending or reaffirming the 2008 lease terms to ensure the mining venture's continuity. This agreement, which involved Royal Gold's participation, was also executed without valid authority or notice to the community. It further locked in the outside companies'

20

control over Tetlin's mineral resources. Defendant **Michael Sam** (who became Tribal Chief around that time) signed and authorized the 2014 lease extension facilitating the Manh Choh project, but did so without adhering to proper Tetlin tribal ordinances or governance processes. By signing this agreement unilaterally, Chief Sam breached his fiduciary duties to the Tribe – essentially committing the Tribe to a long-term project without consent and potentially waiving aspects of sovereign immunity or oversight in favor of the corporations. Notably, at the same time, Chief Sam was personally employed by a mining contractor on the project, creating a direct conflict of interest that casts doubt on the integrity of his actions.

In **2018**, yet another layer was added to the complex web of unauthorized transactions. **Young's Timber Sublease – Further Clouding of Title:** Young's Timber, Inc. (Joseph Young's company) was granted a sublease or similar agreement by which it obtained a direct interest in some portion of the Tetlin lands or the mining operations. This 2018 sublease purported to formalize Young's Timber's role in the project (for example, giving it rights to timber or ancillary land uses, or a share of mining proceeds) and further entwined Joseph Young's personal interests with the land tenure. Like the prior deals, this sublease was executed without any approval from TNC's shareholders or independent oversight. It exemplifies how Joseph Young layered fraudulent transactions to entrench his control: even as questions mounted about the validity of the original deed and lease, Young sought to secure a formal slice of the pie for himself. The 2018 sublease is void for the same reasons as the other instruments – it stems from the void 1996/2008 transactions and was the product of self-dealing. Its existence, however, has contributed to clouding the title and complicating the unwinding of the larger scheme, as Young would likely claim some legal interest based on that sublease.

21

**f) Illegitimate Changes to Tribal Governance (2019–Present):** In 2019, Defendants and related parties explicitly imposed unauthorized governance changes upon the Native Village of Tetlin without proper consent or lawful authority, fundamentally undermining democratic tribal processes, disenfranchising tribal members, and establishing an illegitimate governance entity favorable to Defendants' corporate interests. These explicit changes violated tribal members' federally protected rights (due process, equal representation), facilitating unauthorized land transactions and leases. Plaintiff explicitly references these governance violations to substantiate claims in this litigation, though no direct monetary or injunctive relief is sought against this illegitimate entity within this complaint.

**g) Defendant's Explicit Admission of Invalid Mineral Lease:** Plaintiff explicitly provides evidence from Defendant Contango ORE's publicly filed Form 10-K (page 15), admitting substantial deficiencies in the mineral lease title. Defendants explicitly stated: ***"Prior to conducting any mining activity...we will obtain a full title review...to identify...deficiencies in title to the lease...However, such deficiencies may not be cured by us. It does happen...that the examination...reveals that the title to properties is defective, having been obtained in error from a person who is not the rightful owner of the mineral interest desired."*** By their explicit admission, Defendants knowingly proceeded without valid title, submitting misleading permit applications to regulatory authorities. Plaintiff therefore requests immediate judicial invalidation of permits associated with these defective leases, injunctive relief halting operations, and an independent judicial inquiry to ascertain the full scope and legality of these invalid lease transactions.

**Defendants** explicitly knew or should have known about the federally protected status and explicit restrictions clearly outlined in the congressional land patent explicitly referenced in the

22

2008 Mineral Lease. Their subsequent decision to proceed with leasing, permitting, and extraction activities despite this explicit knowledge clearly demonstrates either intentional misconduct and fraudulent behavior, or a negligent and reckless disregard for clearly documented federal protections. Both scenarios explicitly violate federal law, fiduciary duties, and plaintiffs' federally protected rights.

**f) Invalid Permits and Procedural Irregularities:** In the course of developing the mining project, Defendants (including Contango, Kinross, Peak Gold, and various state agencies) obtained numerous government permits and approvals (environmental permits, land use permits, rights-of-way, etc.). Plaintiff alleges that many of these permits were improperly or fraudulently obtained because they were based on false, misleading, or incomplete information – particularly regarding the applicant's legal authority over the land:

- **Lack of Valid Mineral Lease:** Contango ORE publicly acknowledged (in SEC filings) that it did not have a valid mineral lease from Tetlin Native Corporation, which, under the 1981 federal patent, is the entity that holds legal title to the land. This means that when applying for state mining and environmental permits, the project proponents lacked a proper underlying property interest. The omission or obfuscation of this fact in permit applications invalidates the legal basis for those permits. In essence, all regulatory approvals for the mine were predicated on a faulty premise (that the Tribal Council's lease was valid).

- **Misrepresentations in Permit Applications:** Documents submitted to state agencies (for example, for a Waste Management Permit No. 2023DB0001, among others) contained inconsistencies and misleading statements about who the true property owner

23

or lessor was, and who would be responsible for compliance. The use of the Tribal Council as the purported landowner in permit paperwork, without disclosing the dispute over authority, obscured accountability and violated regulatory requirements for truthful disclosure.

- **Environmental and Safety Oversights:** The permitting process also featured inadequate environmental assessments. Critical hazards – such as the potential for acid-generating or metal-leaching waste rock, risks of groundwater contamination, and significant seismic instability in the area – were downplayed or ignored in the project's environmental documents. Defendants failed to conduct or disclose sufficient geological and environmental studies, and they dismissed or minimized known safety concerns, thereby bypassing safeguards that should protect the Tetlin environment and community.

- **Flawed Public Process:** State regulators provided only a minimal 32-day public comment period on key permits and refused to hold any public hearings despite requests from Tetlin community members and others. This curtailed meaningful community participation and transparency. Such a rushed and opaque process fell short of state and federal standards for public consultation, especially given the magnitude of the project's impact on an Indigenous community's land.

Due to these material irregularities in the permitting of the project, Plaintiff contends that any government approvals related to the mining project lack integrity and should be subject to revocation or reevaluation. Defendants' strategy of pressing forward with permits despite the lack of clear title and inadequate environmental review further exemplifies the continuing nature of the violations against Tetlin's rights.

24

**g) Relevant Legal Precedents and Authorities.** Several legal precedents (from federal and Alaska courts) underscore the legal protections for Native lands and the impropriety of the actions challenged here. Key among them are:

- *Akiachak Native Community v. U.S. Department of the Interior* (D.D.C. 2016) – Confirms that the federal government retains oversight authority over land transactions involving Alaska Native lands post-ANCSA, supporting federal jurisdiction in disputes like this one.

- *Alyeska Pipeline Service Co. v. Kluti Kaah Native Village* (Alaska 2004) – Recognizes the legitimacy of quiet title actions and other legal remedies to address unauthorized uses of Native corporation lands, affirming that those harmed by such misuse can seek relief in court.

- *Jimerson v. Tetlin Native Corp.*, 144 P.3d 470 (Alaska 2006) – A crucial case involving TNC itself, which definitively held that transactions affecting ANCSA lands (such as large land transfers) are invalid absent proper shareholder consent and fiduciary transparency. *Jimerson* validates Plaintiff's contention that the 1996 transfer violated ANCSA and was void.

- *Chugach Natives, Inc. v. Doyon, Ltd.* (D. Alaska 1984) – Clarifies the standards under ANCSA for conveyance of land interests and emphasizes that any transfer of ANCSA land must strictly comply with statutory requirements – relevant to show that the 1996 deed and similar transactions were improper.

- ***Alaska v. Native Village of Venetie Tribal Gov't***, 522 U.S. 520 (1998) – A U.S. Supreme Court case affirming that lands conveyed under ANCSA (and subsequently not "Indian country") still involve important questions of federal law and tribal sovereignty. *Venetie* underscores that disputes involving the nature of ANCSA lands and tribal authority raise federal issues, reinforcing federal-question jurisdiction here.

These authorities collectively support Plaintiff's claims – confirming federal jurisdiction, the necessity of shareholder and tribal consent for land deals, and the continuing federal responsibility to ensure Native lands are not misappropriated.

**h) Statute of Limitations Regarding ANCSA Lands and Continuing Violations.** Plaintiff affirmatively alleges that his claims are timely because of the unique nature of the lands and the ongoing pattern of wrongful conduct. The lands at issue are federally patented ANCSA lands, and the legal framework governing them (including federal trust principles) prevents the normal running of state-law statutes of limitations in the manner Defendants might argue. Specifically, Plaintiff invokes 28 U.S.C. § 2415 (governing time limits on certain actions involving the United States or its rights in property), the federal discovery rule, and the continuing violation doctrine recognized by the U.S. Supreme Court (see *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Under these doctrines, the clock on any limitations period did not begin to run until the Plaintiff and the Tetlin community discovered (or with due diligence could have discovered) the facts constituting the violation, and ongoing wrongful acts reset or toll the limitations period. Here, many of the violations are continuing in nature and have only recently come to light. The fraudulent concealment of material facts – such as the secret profits to certain individuals and the true lack of authority behind the land transfers – means that any limitations period is tolled until

26

discovery of the fraud. Moreover, Defendants' conduct (including the ongoing mining, misappropriation of resources, and concealment of information) constitutes a continuous series of wrongful acts up to the present, which falls under the continuing violation doctrine. Plaintiff also expressly invokes the federal trust responsibilities inherent in ANCSA and federal Indian law: these impose ongoing fiduciary obligations on those managing Native assets, and breaches of such duties can be treated as continuing until remedied.

Accordingly, Plaintiff's claims are **not barred** by any statute of limitations. They remain timely and fully actionable. To the extent any Defendant raises a statute-of-limitations defense, Plaintiff will show that such defense is inapplicable due to the aforementioned discovery rule, continuing violations, and the equitable tolling that applies where fraud and breach of trust were concealed from those harmed.

i) **Substantive Due Process and Constitutional Issues.** This case presents significant issues of constitutional law in the background of the claims. The transactions and conduct described herein implicate the Fifth Amendment (which prohibits deprivation of property without due process of law) and the Fourteenth Amendment (which guarantees equal protection and due process under state law) because Defendants' actions have effectively deprived the Native Village of Tetlin and the Tetlin Native Corporation (TNC) its members of their property and rights without proper notice, authorization, or process. Although constitutional claims are not directly pleaded against a governmental entity in this action, the relief sought is consistent with fundamental constitutional principles protecting property and the rights of Indigenous peoples. The Indian Civil Rights Act (25 U.S.C. §§ 1301–1303) imposes similar due process and equal protection requirements on tribal governments, and those principles have been violated by the

way the 1996 and 2008 transactions were carried out (in secret, without fair representation or consent of the community).

**J) Reservation of Rights:** Plaintiff specifically reserves the right to challenge any broader constitutional issues with ANCSA or other statutes in a separate action if necessary. While due process and equal protection concerns are raised herein (particularly regarding the 2019 disenfranchisement of tribal members and the lack of any meaningful process before land was transferred), this complaint focuses on immediate equitable relief – quieting title, invalidating void contracts, freezing assets, and obtaining remedies for the Tetlin community. Plaintiff does not waive any potential larger claims (such as a direct constitutional challenge to certain provisions of ANCSA or other laws) and expressly reserves the ability to pursue those in the appropriate forum. The goal of this action is to promptly remedy the specific harms suffered, without prejudice to any further claims by TNC, the Tribe, or individual Tetlin members for damages or other relief in the future.

**k) International Human Rights Context:** Although not directly enforceable in this Court, it bears noting that the relief sought aligns with principles of international Indigenous rights – for example, the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP), which recognizes Indigenous peoples' rights to control their lands and resources. These principles highlight the importance of the claims raised here. Ultimately, however, Plaintiff's claims are grounded in U.S. law and the U.S. Constitution, and it is under those authorities that relief is sought.

**l) Fraud, Concealed Self-Dealing, and Breach of Fiduciary Duty (Kristie Charley and Joseph A. Young).** A core aspect of this case is the deliberate fraud and self-dealing carried out

28

by Defendants **Joseph A. Young** and **Kristie Charley (Young)**, who abused their positions of influence to personally profit from Tetlin's lands at the expense of the community.

**m) Concealed Financial Interest in the 2008 Lease:** When the expansive 2008 mineral lease to Contango was arranged, Joseph Young and his daughter Kristie made sure that they would secretly benefit. Kristie Charley (née Young), while holding a role in Tetlin's tribal governance, actively helped negotiate and set up the lease but kept her role hidden from the public record. She ensured that upon execution of the lease, exploration and support contracts flowed immediately to Young's Timber, Inc. – her father's company. In this way, the Youngs had a direct financial stake in the lease's outcome: Contango got the mineral rights, and the Young family got lucrative side contracts. This arrangement was never disclosed to the Tribe or to TNC's other shareholders. The community was led to believe that the lease was a favorable deal brokered by their leaders for the Tribe's benefit, when in fact (Joseph and Kristie) had betrayed the community's trust for private gain. Such conduct amounts to fraudulent self-dealing and a clear breach of the duty of loyalty. As fiduciaries (formal or de facto) to the Tribe and the corporation, Joseph and Kristie had an obligation to act solely in the interest of their people; instead, they put their own financial interests first and misled everyone about it.

**Undisclosed Business Interests and Breaches of Duty:** Neither Joseph Young, nor Kristie Young/Charley disclosed that they stood to benefit financially from the Contango lease via Young's Timber. By concealing their intertwined family and business interests, they deprived the Tetlin community of the opportunity to scrutinize or reject the deal. This was a blatant breach of the fiduciary duty of loyalty and candor. Under corporate law and tribal law principles, any officer or insider must fully disclose potential conflicts of interest and refrain from self-dealing unless it is approved by informed, disinterested decision-makers. Here, Joseph and Kristie did

the opposite: they hid the conflict, thereby inducing the Tribal Council (or those members unaware of the scheme) to agree to the lease under false pretenses. Had it been known that the Young family was effectively "cutting itself in" on the mining deal, the transaction would never have been accepted by the community. The Youngs' conduct constitutes fraud (intentional misrepresentation and omission of material facts) on the Tribe and on TNC's shareholders.

**Governance Manipulation in 2019:** After the mining venture was underway, Kristie Charley used her authority to alter Tetlin's tribal governance structure in 2019. She drove the adoption of new tribal ordinances that stripped many tribal members of their voting rights (for example, imposing new membership or residency rules that disenfranchised a large portion of the community) and centralized power in the hands of a few council members (including presumably herself and allies). These changes had the effect of entrenching the Youngs' influence and insulating the 1996 deed and 2008 lease from challenge: with much of the opposition unable to vote or removed from Council, the remaining leadership (aligned with the Youngs) could continue the status quo. These 2019 actions violated basic tenets of the Tribe's 1940 Constitution under the Indian Reorganization Act (IRA) and general principles of democratic governance. They also further breached any fiduciary duties owed by Kristie to the tribal members – instead of acting in the community's best interest, she literally changed the rules to maintain her family's illicit advantages. The ordinance changes are void *ab initio* if they violated the Tribe's constitutional processes, and they underscore the lengths to which the Youngs went to preserve their scheme.

In summary, **Joseph A. Young and Kristie Charley** abused their positions of trust to enrich themselves, perpetrating a fraud on the Tetlin people. They facilitated unauthorized land transactions, siphoned off contracts and benefits, and then restructured tribal governance to cover

30

their tracks. Their actions were willful, malicious, and in knowing violation of both federal law (ANCSA's requirements and federal fiduciary standards) and any applicable tribal or state law duties. Through this lawsuit, Plaintiff seeks to hold them accountable: to void the transactions they orchestrated, to disgorge their ill-gotten gains, and to bar them from further harming the community.

## V. Conflicts of Interest and Fiduciary Breaches by State Officials

The scheme alleged in this complaint was enabled not just by internal actors, but also by the complicity or negligence of certain **State of Alaska officials and institutions**, which created conflicts of interest and breached their own duties to uphold the law. Although no state officials are named as defendants here, their involvement forms part of the factual background and context for relief.

**a) State Facilitation of Unauthorized Dealings:** Various state regulators and policymakers "smoothed the path" for the mining project despite clear red flags regarding land title and community opposition. For instance, state agencies (such as the Department of Natural Resources and Department of Environmental Conservation) granted permits and licenses for the Manh Choh project even though the applicants could not demonstrate a valid lease from the actual landowner (TNC). By proceeding to authorize the project under these circumstances, those officials ignored ANCSA's requirements and the rights of the Tetlin Native Village, and Tetlin Native Corporation, and shareholders. Additionally, the Alaska Industrial Development and Export Authority (AIDEA) and state-affiliated investment funds (like the Alaska Future Fund) invested public resources into the project, potentially creating an incentive for state actors to push the project forward at all costs. These actions suggest that certain state officials prioritized

31

corporate and political interests over legal integrity, knowingly enabling a project that lacked clear title and community consent.

**b) Potential Conflicts of Interest:** At least one example of a conflict is the Alaska Future Fund's involvement: a state-managed fund (meant to benefit Alaskans) invested in Contango's project, which might explain a reluctance by state regulators to scrutinize the project rigorously. There is also the possibility that former state employees or officials had ties to the companies – for example, lobbying, consulting contracts, or even future employment – which, if true, would indicate a conflict between their public responsibilities and private gain. These conflicts of interest may have greased the wheels for Defendants to maintain their unlawful hold on Tetlin's land without state intervention.

**c) Supremacy of Federal Law:** To the extent that any Defendant might argue that state corporate law or the actions/inaction of state officials legitimize the transactions, such an argument fails. Under the Supremacy Clause of the U.S. Constitution (Article VI) and the Indian Commerce Clause (Article I, Section 8, Clause 3), federal law and policy concerning Native American lands override any contrary state law or actions. ANCSA and federal common law impose duties and restrictions that cannot be nullified by Alaska state incorporation law or by a wink and nod from state regulators. Put simply, the fact that TNC is an Alaska corporation does not give the State free rein to approve transfers of its ANCSA lands that violate federal mandates. Nor can state officials' complicity shield Defendants from liability – federal protections for Native lands and peoples prevail over any inconsistent state practices or decisions.

**d) Breach of Public Trust:** Those state officials who facilitated the project's approvals despite the known issues effectively breached the trust of the public and violated the rights of the Tetlin

32

Tribe. For example, by denying the community a meaningful voice in the permitting process (refusing hearings, etc.), they failed to uphold principles of environmental justice and due process. While they are not defendants here, their actions reinforce why robust federal oversight and judicial intervention are necessary. In fashioning relief, Plaintiff will ask the Court to ensure that no deference is given to any state action or inaction that conflicts with federal law or equity. Indeed, part of the requested relief is a declaration clarifying that an ANCSA corporation cannot be used as a vehicle to undermine tribal self-governance – a point directed at preventing future State-facilitated end-runs around federal protections.

In summary, this case not only involves breaches of duty by tribal and corporate actors, but also highlights a systemic failure by state actors to protect Tetlin's rights. The Court's intervention is needed to realign the outcome with federal law, justice, and the public interest.

**VI. Absence of Tetlin Tribal Council as Indispensable Party: VI.**

The Tetlin Tribal Council (the governing body of the Native Village of Tetlin) is not named as a defendant in this lawsuit. Plaintiff acknowledges that the Tribal Council was involved in certain transactions at issue – notably, the Council was the grantee of the 1996 quitclaim deed and a signatory lessor in the 2008 Contango mineral lease. However, Plaintiff alleges that the Council's actions in those matters were ultra vires (beyond its legal authority) and therefore void ab initio. As such, the Tribal Council as an entity has no legitimate legal interest in the subject property that would require its participation in this quiet title action.

The Tetlin Tribal Council does not possess sovereign immunity for any matter relating to the mining project on Tetlin lands, including but not limited to lease agreements, royalty modifications, or approvals affecting land title or environmental impact. The Council expressly waived such immunity when it signed the 2014 "Stability Agreement" with Royal Gold and related corporate entities. This waiver extends to all decisions, authorizations, or transactions arising from or relating to that agreement.

33

Furthermore, any assertion of tribal authority by the current Tetlin Tribal Council is legally and ethically invalid due to the illegitimate 2019 amendment of Tetlin's tribal law, which unlawfully altered traditional governance structures and disenfranchised legitimate tribal members. As a result, the current Council has no lawful authority to represent the tribe, speak on its behalf, or interfere with litigation concerning tribal land and rights. Its standing to object or participate in this matter is, therefore, void.

Under Rule 19 of the Federal Rules of Civil Procedure, a party is "indispensable" only if the court cannot accord complete relief among the existing parties or if the absent party claims an interest such that disposing of the action may impair that interest or leave existing parties at risk of inconsistent obligations. Here, quieting title to the land can be achieved by a declaration that the Tribal Council's purported interest (from the 1996 deed) is null and void without requiring the Council to be a party. The Tribe's sovereign immunity also prevents joining the Council without its consent, but crucially, no relief is sought against the Tribe itself. The relief sought is in rem (directed at the property and the record title) and is pursued against the private Defendants who currently claim interests adverse to TNC.

In other words, the Council's "acceptance" of the 1996 deed and its execution of the 2008 lease were not lawfully authorized, and thus those acts can be declared void without the Council present. The Council is not an indispensable party to adjudicating the rightful title to the land, because upon a finding that the 1996 and 2008 transactions are void, the Council will be understood to have no valid claim or interest under federal law in the property. No party will be prejudiced by the Council's absence because the Council, having no lawful interest, loses nothing that it was entitled to, and the current Defendants (the corporations and individuals) are the ones claiming the benefits of the void transactions and can adequately represent any arguments in favor of those transactions.

In sum, Plaintiff proceeds without joining the Tetlin Tribal Council, both out of respect for tribal sovereignty and because the Council's inclusion is unnecessary: the case can and should determine the land's title without the Tribe as a litigant. The outcome sought (restoring title to TNC) does not impose any obligation on the Tribal Council; it merely nullifies unauthorized acts. Thus, the Tribal Council is not an indispensable party, and this action may properly continue in its absence.

34

**VII. Claim for Relief – Quiet Title:**

**Quiet Title Over Tetlin Lands:** Plaintiff seeks to quiet title to **all lands patented to Tetlin Native Corporation under ANCSA**, which were improperly transferred or encumbered by the transactions described above. Plaintiff requests that this Court enter a declaratory judgment establishing that Tetlin Native Corporation is the rightful and sole owner in fee simple of all such lands, free and clear of any adverse claims by the Defendants or any other entities claiming through the void transactions. Plaintiff requests that this Court enter a declaratory judgment establishing that Tetlin Native Corporation is the rightful and sole owner in fee simple of all such lands, free and clear of any adverse claims by the Defendants or any other entities claiming through the void transactions.

This declaration should expressly invalidate and extinguish any purported interest or cloud on TNC's title, including but not limited to: (1) the Tetlin Tribal Council's purported title arising from the 1996 quitclaim deed; (2) the leasehold or mineral interests claimed by Contango ORE, Inc., Peak Gold, LLC, Kinross Gold (via its subsidiary), or any affiliates under the 2008 mineral lease or the 2014 "Stability Agreement"; (3) the sublease or contract interests claimed by Young's Timber, Inc. or Joseph A. Young (such as those arising from the 2018 sublease or service agreements); and (4) any other encumbrances, agreements, liens, or conveyances that derive from or rely upon the 1996 deed, 2008 lease, or related unauthorized acts.

In essence, Plaintiff asks the Court to restore the land title to its status under ANCSA before these unlawful acts occurred — i.e., to confirm that title is vested in Tetlin Native Corporation (for the benefit of its Native shareholders) and that no Defendant or third party has any estate, interest, or right in the subject lands by virtue of the challenged transactions. Such relief will

35

remove the uncertainty and conflict over ownership and ensure that control of the land is back in the hands of the Tetlin people through their corporation, as was intended by Congress.

**Invalidation of Void Instruments:** As a necessary component of quieting title, Plaintiff asks that the Court declare the following instruments **null, void, and of no legal effect**:

- The **1996 Quitclaim Deed** from TNC to the Tetlin Tribal Council;

- The **2008 Mineral Lease** between the Tribal Council and Contango (and any extensions or amendments thereto, including the 2014 Stability Agreement);

- The **2018 Young's Timber sublease** or contracts granting interests in the land or project to Joseph Young or his company;

- **Any other contracts, leases, joint venture agreements, Permits, or deeds** predicated on the above void instruments.

Because these documents violated federal law (ANCSA) and TNC's and the Tribe's internal rules (no shareholder or proper tribal consent), they never conveyed any valid interest in the land to begin with. The Court's decree should direct that these instruments be cancelled and, if necessary, removed from any public land records (such as state recording district files) to prevent further confusion about the land's ownership.

By explicitly cancelling these documents and quieting title in TNC, the Court will clarify that Defendants have no lawful estate or right in Tetlin's lands and that any activities or claims based on those void documents must cease.

36

**Burden of Proof and Presumption of Invalidity:**

Plaintiff explicitly asserts a presumption of invalidity for all challenged actions, transactions, leases, permits, and agreements due to documented procedural violations, fiduciary breaches, self-dealing, and fraud. Plaintiff respectfully requests this Court explicitly place the burden of proof on Defendants to affirmatively demonstrate that each challenged action fully complied with federal and tribal law, fiduciary duties, and procedural requirements. This strategic shift explicitly ensures judicial efficiency, fairness, and protection of tribal and community rights.

## VIII. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. **Declaratory Relief – Title Ownership:** A declaration that **Tetlin Native Corporation is the lawful owner in fee simple** of **all lands patented to it under ANCSA**, and that TNC's title is superior to any and all adverse claims by Defendants or those claiming under them. This declaration will affirm that TNC has full and exclusive title, as if the 1996 deed and subsequent transactions had never occurred.

2. **Declaratory Relief – Comprehensive Invalidity of Transactions Arising from the 1996 Quitclaim Deed:**

   Plaintiff respectfully requests that this Court explicitly declare the July 17, 1996 Quitclaim Deed—transferring Tetlin lands for nominal consideration ($10)—void ab initio in accordance with controlling Alaska Supreme Court precedent, particularly as articulated in Jimerson v. Tetlin Native Corp., 144 P.3d 470 (Alaska 2006), which establishes that tribal councils cannot lawfully transfer lands they do not own. Plaintiff further requests the Court explicitly recognize that all subsequent leases, deeds,

37

agreements, permits, waivers, or authorizations of any kind executed by the Tetlin Tribal Council, its agents, or affiliated entities deriving authority from this invalid deed, including but not limited to documents signed by individuals purporting to represent legitimate tribal authority, are inherently and unavoidably invalid, void, and unenforceable. Plaintiff thus seeks a judicial declaration explicitly and clearly restoring full legal ownership, authority, and control of the entirety of Tetlin lands to Tetlin Native Corporation, free from all purported encumbrances or interests improperly derived from this foundationally invalid transaction.

3. **Permanent Injunction – Cease Unauthorized Mining:** A permanent injunction prohibiting Defendants (and all those in active concert with them) from entering upon, mining, exploring, or otherwise exploiting the Tetlin lands in reliance on the void 1996 deed, 2008 lease, or any related invalid agreement. This injunction should halt all mining operations, ore transportation, or land-disturbing activities on the subject lands unless and until proper authority is obtained (i.e. a valid lease or permission granted with TNC shareholder approval and in accordance with law). The purpose of this relief is to stop the ongoing trespass and irreparable harm to Tetlin's land and resources while the rightful ownership is reinstated.

4. **Declaratory Relief – Tribal Governance Rights:** A declaration that any tribal ordinances, resolutions, or governing measures enacted in or around 2019 that restricted tribal members' voting rights or altered Tetlin's governance (specifically the changes orchestrated by Kristie Charley and associates) are **null and void**. The Court should find that those measures violated the Native Village of Tetlin's organic law (e.g., its 1940 IRA

38

Constitution) and fundamental principles of due process and equal protection. This will restore the political rights of disenfranchised Tetlin tribal members and ensure that tribal governance returns to a legitimate footing consistent with federal law and the Tribe's true will.

5. **Clarification of Tribal Sovereignty and Federal Law Supremacy:** Issue a declaratory statement clarifying that nothing in ANCSA or state law diminishes the inherent tribal sovereignty of the Native Village of Tetlin and that federal law (including constitutional protections and statutes like 42 U.S.C. § 1983) supersedes any state actions or arrangements that conflict with the rights of the Tetlin Tribe and its members. In particular, the Court should explicitly recognize that the corporate framework imposed by ANCSA (which created entities like TNC) did not extinguish the federal recognition of the Tetlin Tribe as a sovereign entity, nor did it strip tribal members of constitutional protections. Any interpretation of ANCSA that would allow a Native corporation's board, or anyone else, to deprive Native people of property without due process or just compensation is inconsistent with the U.S. Constitution and therefore invalid. The Court's declaration should reaffirm that the Native Village of Tetlin remains a federally recognized tribe with all attendant rights, and that its members are entitled to equal protection and due process in all dealings, whether through a corporation or otherwise. Furthermore, to the extent Defendants or others might argue that state incorporation or state officials' actions have primacy, the Court should clarify that under the Supremacy Clause (Article VI of the U.S. Constitution) and the Indian Commerce Clause (Article I, Section 8, Clause 3), federal protections for Native lands and peoples prevail. This

39

declaratory relief will serve as important guidance not only in this case but for any future interactions between the Tetlin Tribe, TNC, and state entities, helping to prevent the recurrence of the legal misunderstandings that may have contributed to the issues at hand.

6. **Restitution and Disgorgement:** An order requiring Defendants to disgorge and provide restitution for **all profits, proceeds, and benefits** obtained from the unauthorized use of Tetlin lands. This includes, but is not limited to: all revenues from the extraction or sale of gold or other minerals from the land; the value of any ore removed from the land; any royalties, fees, or payments received under the void agreements (e.g., payments received by Contango or Kinross from selling project interests; payments to Young's Timber or Joseph Young under contracts; royalty payments to Royal Gold; etc.). The Court should direct a full accounting by Defendants of all such gains. Once quantified, those sums should be paid into a constructive trust for the benefit of Tetlin Native Corporation (and by extension its Native shareholders and the Tetlin Tribe). This ensures that Defendants do not retain the fruits of their wrongdoing and that the community is compensated for its losses. Additionally, any specific ill-gotten gains identified – such as consulting fees or contract profits paid to Young's Timber or kickbacks to individuals – should be disgorged and returned via the trust or directly to TNC.

**Court-Supervised Forensic Audit Requirement:**

Plaintiff further requests that the Court appoint an independent, certified forensic auditor to conduct a full forensic accounting of all relevant financial activities connected to the unauthorized use of Tetlin lands. This audit shall include, but is not limited to: all revenue derived from resource extraction, sale of minerals, joint venture profits,

40

contracts, subleases, government grant funds, tribal accounts, and any financial activity involving Young's Timber, Joseph Young, Kristie Charley, and affiliated individuals or entities.

The selected auditor must be fully independent, possess forensic accounting credentials (CPA/CFE), and be subject to Court approval. All Defendants shall bear the cost of the forensic audit jointly and severally, or in the alternative, the cost may be deducted from assets frozen or recovered under this Court's orders.

The auditor shall report directly to the Court or Court-appointed receiver, with findings filed under oath and made available to federal investigative authorities (e.g., FBI, IRS) if warranted. The Tetlin Native Corporation and tribal community shall bear no cost for the forensic accounting process. This audit will ensure all profits, contracts, and misappropriated funds are identified, recovered, and placed into the constructive trust for the benefit of the community.

7. **Appointment of Independent Receiver/Trustee:** The appointment of a neutral receiver or trustee to assume interim control over Tetlin Native Corporation's affairs insofar as they relate to land management and the implementation of the Court's orders. This Court-appointed fiduciary would have authority to: oversee the unwinding of the void transactions; manage the lands and any income or assets derived from them during the transitional period; and ensure that any future uses of the land are consistent with ANCSA's requirements and the best interests of Tetlin's shareholders, and tribe. The receiver or trustee should also be empowered to help restore sound governance within TNC – for example, by organizing fair elections for TNC's board if needed, securing and reviewing corporate records (which may have been neglected or manipulated), and

41

instituting policies of transparency and accountability. This extraordinary remedy is warranted by the circumstances: TNC's leadership has been deeply compromised by conflicts of interest and breaches of duty, so an independent fiduciary is needed to protect the community's interests until trust and lawful management can be reestablished.

8. **Removal of Joseph A. Young and Affiliates from Tetlin Lands:** An order directing Defendant Joseph A. Young, his agents, and any individuals acting in concert with him (including immediate family members involved in his businesses) to immediately vacate all Tetlin lands, buildings, and facilities occupied or controlled through void transactions.

Plaintiff explicitly requests an immediate injunction prohibiting Young's Timber, Inc., Young's Fuel Logs & Pellets, LLC, Qayaq Construction LLC (as a cooperating entity), and affiliated entities from conducting any logging, construction, resource extraction, transportation, leasing, or other commercial activities on Tetlin lands.

Plaintiff further requests immediate disclosure of related financial records, and equipment under court supervision, posting of an environmental remediation bond, and prohibition against using proceeds from unauthorized activities. This relief is designed to restore full control of Tetlin lands to TNC and end unauthorized operations by Joseph Young and associated entities.

**Constructive Ownership and Community Reversion of Business Assets:**

Plaintiff explicitly alleges that Young's Timber, Inc., and other affiliated or successor entities—such as Young's Fuel Logs & Pellets, LLC—were created, funded, and operated using revenues, contracts, or grants derived from Tetlin lands, often through unauthorized leases or tribal contracts executed without shareholder, or Tribal approval.

42

Plaintiff further notes that Qayaq Construction LLC, though not directly owned or controlled by Joseph A. Young, participated in a documented joint contract with Young and the Tetlin Village involving infrastructure development tied to the Manh Choh mining project. The extent of financial collaboration, profit-sharing, or subcontracting relationships between Qayaq Construction and Young's affiliated entities remains unclear and warrants discovery.

Plaintiff further requests that this Court extend asset preservation and constructive trust protection to **any and all property, accounts, business interests, or financial assets held directly or indirectly by Joseph A. Young, his family members, or affiliated entities**, regardless of their location or formal ownership. This includes assets concealed through shell companies, jointly owned businesses, or accounts registered under the names of relatives or associates, which may have been funded through revenues derived from Tetlin lands, unauthorized leases, or misappropriated federal or tribal funds. These assets—regardless of jurisdiction—shall be frozen under Court supervision and subject to immediate disclosure. Defendants shall be prohibited from transferring, concealing, liquidating, or using any such assets during the course of this litigation. Plaintiff expressly reserves the right to amend this request upon discovery of further concealed holdings, out-of-state properties (including but not limited to any known interests in Hawaii), or improper transfers made to avoid restitution.

Defendants shall be prohibited from transferring, concealing, liquidating, or operating such assets during the course of this litigation. Plaintiff reserves the right to amend this request if further evidence reveals deeper financial or operational ties to third-party entities or shell companies operating in concert with Joseph Young or his affiliates.

43

9. **Turnover of Corporate and Tribal Property:** An order requiring Joseph A. Young, Young's Timber, Inc., and any other relevant persons to turn over all keys, keycards, access codes, passwords, records, and property belonging the Native Village of Tetlin that are in their possession or control. This includes keys/codes to any buildings, gates, or secured areas on Tetlin land; access credentials for financial accounts or computer systems; corporate documents and records (meeting minutes, contracts, etc.); and any Tribal Council records or equipment improperly held by them. All such items and information shall be delivered to the Court-appointed receiver or other official designated by the Court. The purpose is to ensure that the Tetlin community regains full administrative control over its assets, information, and infrastructure, and that the individuals who wrongfully seized control (like Joseph Young) relinquish all mechanisms of control. Plaintiff further alleges that Joseph A. Young is actively using the Tetlin Tribal Council—as unlawfully restructured in 2019—as a front to retain access to tribal, and federal property and records. This includes storage of vehicles, operation of tribal facilities, access to tribal bank accounts, and possession of physical and digital assets originally belonging to the tribe meant for community use.

The Court is therefore requested to extend this turnover order to any property, facility, or record currently held or accessed by Joseph Young or his affiliates **through the tribal council,** including council offices, grant-funded programs, tribal email systems, and infrastructure established with public or tribal funds. All such materials shall be surrendered to the Court-appointed receiver to ensure the Tetlin community regains full and exclusive administrative control. This order shall also apply to **Joseph Young's**

44

**daughters, Kristie Charley (née Young) and Marianna Young,** who are known to be involved in his business affairs and tribal operations, and who may have access to assets, systems, or infrastructure that must be surrendered. All such materials shall be surrendered to the Court-appointed receiver to ensure the Tetlin community regains full and exclusive administrative control.

10. **Preservation of Evidence:** A preservation order requiring all Defendants to preserve and provide to Plaintiff (and/or to the Court/receiver) all records and evidence relevant to the matters in this lawsuit. This includes all communications (emails, letters, texts), contracts, agreements, meeting minutes, financial ledgers, bank records, geological data, permitting documents, and electronic data pertaining to the 1996 land transfer, the 2008 lease, any payments or subleases, permit applications, and any other transactions or events described in the complaint. Defendants should be ordered to promptly compile and turn over copies of these materials to the Court (or a special master/receiver as appropriate) to ensure transparency and to prevent any destruction of evidence. Given the allegations of fraud and concealment, this measure is critical to facilitate further proceedings (such as the accounting and enforcement of relief) and to support any ongoing federal or state investigations into the same underlying conduct.

11. **Asset Preservation – Project Equipment and Infrastructure:** An order that all equipment, machinery, and infrastructure currently located on or used in connection with the Manh Choh mine on Tetlin lands be preserved in place and placed under the supervision of the Court or its agent. Defendants (and anyone acting for them) must not remove, sell, damage, or impair any such assets. This includes, for example: mining

45

equipment and vehicles (excavators, drills, etc.), the fleet of ore haul trucks and trailers (the "Black Gold Transport" trucks dedicated to this project), generators, fuel tanks, buildings or camps, and any stockpiles of ore or overburden. Defendants shall provide the receiver with all keys, manuals, and access codes needed to control and maintain this equipment. All physical keys, fobs, and digital access passcodes shall be clearly labeled by corresponding equipment or vehicle and stored securely on-site under the custody of the designated **Tribal Asset Recovery Coordinator** for safekeeping, accountability, and emergency operational use under court supervision.

**Operational Readiness and Environmental Safety Protocol:**

Plaintiff further requests that this Court order Defendants (and any agents or contractors acting on their behalf) to immediately inspect and top off all fuel tanks, fluid reservoirs, and mechanical systems associated with equipment, vehicles, and storage tanks located on Tetlin lands. This includes, without limitation, diesel and gasoline fuel, engine oil, hydraulic fluid, coolant, brake and transmission fluid, and washer fluid. Ensuring these systems are full and sealed is critical to environmental containment, reduction of condensation within fuel tanks, and prevention of internal corrosion or leakage.

These measures will also support the controlled movement and operational testing of machinery during the pending environmental study ordered to assess current and continuing damage to the land. All work must be completed by certified technicians, with written confirmation and inspection logs submitted to the Court or Court-appointed receiver to ensure compliance and ecological safety.

46

12. **Compensation of Plaintiff's Efforts and Costs of Restoration:** Plaintiff is acting in the capacity of **Tribal Asset Recovery Coordinator**, assuming responsibilities that include legal drafting, preparation for infrastructure recovery, administrative restructuring of Tetlin Native Corporation, and support for forensic audits, environmental assessments, and the restoration of lawful tribal governance. These duties have required Plaintiff to work full-time and without compensation, often in isolation, while preparing to operate in a region with no functioning housing, no internet, and no operational tribal government. Plaintiff has borne the logistical, financial, and legal burdens of coordinating recovery efforts alone and requests support to continue these duties on-site once court access and security measures are established.

**Plaintiff explicitly affirms that he has no employment, fiduciary, contractual, or financial arrangement with Tetlin Native Corporation, the Village of Tetlin, or any tribal member or entity.** Plaintiff's involvement in this matter arises solely from the request of disenfranchised tribal members who had no other recourse and no lawful governance structure remaining to protect their lands, records, or rights.

Plaintiff has received no compensation, contract, or promise of benefit in exchange for his actions. His efforts in legal drafting, document collection, public transparency, and restoration of lawful ownership and governance have been undertaken entirely in good faith, at personal expense, and with no expectation of reward.

Plaintiff does not claim authority, control, or representation over any individual or corporate interest except insofar as it is necessary to restore and protect the Tetlin community's legal rights through this litigation. Plaintiff acts solely in his capacity as a tribal member and shareholder, answering a call to service when no one else would, and

47

asks the Court to recognize that this role was assumed only because the people of Tetlin needed someone to speak.

Plaintiff respectfully requests that compensation be awarded as follows:

- **Reimbursement of out-of-pocket litigation expenses** (as detailed in the attached financial estimates)

- **Reasonable hourly or monthly compensation** for full-time field service during the litigation and transitional period

- **Costs of higher education or professional training**, to equip Plaintiff with the legal, administrative, and grant management tools necessary to serve as an effective field executor of this Court's orders

- **Allowances for travel, lodging, communication, and administrative supplies**, as detailed in the Financial Estimate for Plaintiff Kevin Gunter

All compensation and expense reimbursements shall be:

**Subject to Court approval**

Paid from recovered assets, frozen accounts, or as authorized by the Court

Audited and documented in accordance with the Court's transparency standards

This request is not for enrichment but for justice. It recognizes that Plaintiff's role has become the functional bridge between the Court and a community **ripped apart by the events at issue in this case**—not just by failed leadership, but by the collective consequences of exploitation, betrayal, and systemic neglect. Plaintiff respectfully submits that compensation for such essential, sustained, and high-risk service is both just and necessary.

48

13. **Restoration of Tribal Governance (Democratic Elections):** Plaintiff respectfully requests that the Court issue appropriate injunctive relief directing the restoration of tribal self-governance through a fair and transparent election to be held for the leadership of the Native Village of Tetlin (i.e., the Tribal Council). This election shall occur at the earliest feasible time, under the supervision or guidance of the Court—either through a Court-appointed receiver or a special master—due to the complete absence of legitimate tribal leadership.

At present, there is no functioning or lawful governing body in Tetlin. This vacuum was not accidental, but the result of a coordinated effort involving internal manipulation and external exploitation, particularly through the 2019 unlawful amendments to tribal governance structures and the entrenchment of private interests tied to resource extraction contracts. As a result, the community has been left voiceless, disorganized, and unable to defend its collective rights.

This election shall be conducted in accordance with the Tribe's valid historical governance documents, including the IRA Constitution of 1940, or such structure as may be recognized through community consensus during this transition. The process must adhere to core democratic principles, including one-person-one-vote for all eligible tribal members, and be fully free from coercion, fraud, or manipulation.

The Court may appoint a neutral election supervisor to oversee this process—potentially in coordination with federal agencies experienced in tribal elections, such as the Bureau of Indian Affairs—to monitor voter registration, ballot integrity, and vote counting. During the interim period, the newly restored Council will have authority to advise or cooperate with the receiver on governance matters requiring tribal input.

49

This request does not seek judicial control over tribal governance, but rather seeks to remove the artificial obstruction placed on the community's right to govern itself. The result will be a duly elected Tribal Council—or equivalent governing body—empowered to rebuild trust, lawfully represent Tetlin in ongoing matters, and protect the future of the Tribe through transparent and accountable self-determination.

14. **Structural Reform of TNC's Corporate Governance:** Injunctive relief requiring Tetlin Native Corporation to institute comprehensive governance reforms to prevent such abuses from occurring again. The Court, through the receiver and in consultation with TNC's honest shareholders, should mandate revisions to TNC's bylaws and policies to incorporate safeguards such as: mandatory fiduciary duty training for directors and officers; robust requirements for disclosure of conflicts of interest (with independent review of any insider transactions); enhanced procedures for obtaining shareholder approval of major transactions (especially any transfer or encumbrance of land); regular independent financial audits; and improved mechanisms for shareholder oversight (for example, lowering thresholds to call special meetings or allowing removal of directors for cause by shareholder vote). The receiver/trustee can draft these reforms and present them for Court approval. The Court should maintain supervision during a transition period while these reforms are implemented, perhaps requiring periodic reports. Once the Court is satisfied that TNC has a reformed, functional Board of Directors elected by shareholders and operating under the new rules in good faith, the receiver can be discharged and full control returned to TNC's management. The objective is to ensure that after this litigation, TNC will operate lawfully, transparently, and for the benefit of

its Native shareholders, as Congress intended, and that a small group of insiders can never again mismanage and dispose of virtually all corporate land without consent.

15. **Environmental Protection – Bonding and Remediation:** An order requiring all Defendants involved in the mining operations (Contango, Kinross, Royal Gold, Young's Timber, and any related entities) to post adequate environmental reclamation bonds or funds specifically earmarked for the restoration of Tetlin's lands. The Court should determine the amount after input from independent experts, taking into account any environmental disturbance already caused (road construction, drill pads, possible contamination from fuel or chemicals, etc.) and the potential future risks if the site is not properly closed. These funds will be held in trust under the Court's or receiver's oversight and used exclusively for remediation of the land – such as removing mining debris and equipment, re-contouring and re-vegetating disturbed areas, monitoring water quality, and any other necessary cleanup. Because Tetlin's land has a unique status and importance, the Court should ensure this bonding is in addition to (and separate from) any state-required reclamation bonds, which may be insufficient or otherwise not readily accessible to the Tetlin community. This relief places the financial burden of environmental restoration on the parties who conducted the operations, not on the Tetlin people or the public, and it protects the land – an irreplaceable asset to the Tribe – from being permanently scarred. Plaintiff further requests that the Court establish a separate Environmental Remediation Trust, to be funded directly by Defendants and held under Court supervision, independent of any existing state reclamation bond. This trust shall be used exclusively for the benefit of Tetlin Native Corporation and the Native Village of

51

Tetlin, and shall be administered by a neutral trustee with advisory input from a community-designated environmental oversight committee.

This trust will provide the resources necessary for long-term land restoration, culturally informed rehabilitation efforts, environmental monitoring, and emergency response. Defendants may seek reimbursement or credit from any state-held bond through separate proceedings, but this trust shall be fully funded and operational without delay, ensuring Tetlin's lands are restored by those who caused the damage—not left vulnerable to bureaucratic delay or political interference.

16. **Audit and Invalidation of Improper Permits:** An order directing a thorough independent audit of all government permits, licenses, and approvals obtained for the mining project, and invalidating any that were procured through misrepresentation or fraud. This audit (performed by a special master or in coordination with appropriate agencies) will review whether Defendants failed to disclose the land title issue or other material facts in their applications, or whether any documents were falsified. If any permits or approvals (state or federal) were improperly obtained – including environmental permits, land use permits, rights-of-way, etc. – the Court should declare those permits **void**. Additionally, the audit should trace any financial benefits Defendants derived from such permits (for example, state grants for infrastructure premised on the project, tax credits, or any public funds received). If benefits were obtained under false pretenses, the Court should order that they be disgorged and paid into the constructive trust for the Tetlin community's benefit. The aim of this relief is to ensure that

Defendants do not retain any advantage from gaming the regulatory system and that all project-related activities are brought into line with the law (or halted, if unlawful).

17. **Impoundment of Transportation Equipment ("Black Gold" Trucks):** An order identifying and seizing/impounding the fleet of ore-haul trucks and trailers used to transport ore from Tetlin to the Fort Knox mill (often referred to as the "Black Gold Transport" fleet of 52 Kenworth T880 trucks and double-trailers, financed or provided by Kinross). These vehicles are to be secured at a designated location under the receiver's or law enforcement's supervision. Defendants must surrender all keys and access devices for the trucks, and onboard data (GPS logs, etc.) must be preserved. This relief serves multiple purposes: it prevents the continued removal of ore from Tetlin land in violation of the injunction; it preserves evidence contained in the trucks' systems (which may reveal the extent of ore hauled and any regulatory violations); This impoundment order serves critical functions:

- Preventing continued ore extraction and transport in violation of the injunction
- Preserving GPS logs, cargo manifests, and other digital evidence contained within the vehicles
- Ensuring that the vehicles remain in secured, court-supervised custody for potential future use in environmental field operations, infrastructure response, or other court-authorized purposes

The Court shall further authorize the **Tribal Asset Recovery Coordinator**, acting under court supervision, to relocate or temporarily operate the vehicles if necessary to facilitate

53

environmental studies, logistical access, or humanitarian fieldwork, with all activity logged and reported.

This measure is vital to maintain operational readiness, protect evidence, and secure high-value assets until lawful tribal authority is fully restored and appropriate final distribution or use of these assets is determined by the Court.

the Court can pause one of the most damaging ongoing harms and maintain the status quo pending final resolution.

18. **Extension of Asset Freeze to Contractors/Third Parties:** An order extending the asset preservation directives to any contractors, subcontractors, or third-party service providers involved in the project. Companies providing construction, drilling, catering, security, lodging, or other services on Tetlin land must similarly cease operations and cooperate. Any heavy machinery, vehicles, portable structures (work camps), fuel supplies, or equipment they have on Tetlin land must be identified, inventoried, and secured under the receiver's oversight. Additionally, these third parties should be ordered to preserve and hand over any records they possess related to their work on the project (contracts with Defendants, invoices, communications, etc.). This ensures Defendants cannot circumvent the Court's orders by acting through nominally separate entities and that no assets or evidence is shuffled away by using contractors. It also notifies all such parties that, since the project's authorization was invalid, they must halt any further action and abide by the Court's mandates.

19. **Preservation of Off-Site Assets and Proceeds:** An order requiring Defendants Contango, Kinross, Royal Gold, Young's Timber, and any affiliates to disclose and

preserve any other assets or property, wherever located, that were acquired with proceeds from the Tetlin project or that could be used to satisfy a judgment. This includes any stockpiles of ore (for example, if Kinross has stockpiled Tetlin ore at Fort Knox or elsewhere), any gold or minerals already processed or extracted from Tetlin's land, and any specialized equipment or facilities dedicated to the project (even if off-site). The Defendants should be enjoined from transporting any ore or concentrates out of Alaska or otherwise disposing of such assets. If necessary, the Court should issue further orders (like attaching or freezing accounts or shipments) to prevent removal of proceeds from the Court's reach. The principle here is that the harm from the unauthorized extraction extends to wherever the extracted minerals or resulting profits have gone; thus, a comprehensive approach to restitution requires preserving assets statewide (or beyond). By securing these, the Court can ensure that any final judgment can be enforced without assets having been secreted away.

20. **Disclosure of Public Relations/Lobbying Expenditures:** An order compelling Defendants (particularly Contango, Kinross, Royal Gold, and Young's Timber) to fully disclose any expenditures over the past ten years on media campaigns, public relations, lobbying efforts, or donations in Alaska that relate directly or indirectly to the Tetlin (Manh Choh) project or mining on Native lands. This should include money spent on advertising or sponsorships intended to sway public opinion (such as sponsored local news segments or funding community events while the project was under consideration), hiring of lobbyists or PR firms to influence policymakers, charitable donations targeted to communities or organizations to garner goodwill, and funding of studies or publications

55

about the project or mining policy. For each such expenditure, Defendants should provide the date, amount, recipient, and purpose. The Court may appoint an independent auditor to verify the completeness of these disclosures. The purpose of this relief is to bring to light any attempts by Defendants to manipulate public discourse or policy regarding the project, which may have hindered the Tetlin community's ability to assert its rights (for example, if Defendants funded misleading information campaigns or lobbying that minimized the legitimacy of the Tribe's concerns). While this is primarily an informational remedy, it could support further equitable relief if, say, funds were misused to improperly influence processes that affected Plaintiff's rights.

21. **Comprehensive Protective Order and Immediate Injunction:** Plaintiff explicitly requests the Court issue an immediate Protective and Restraining Order explicitly mandating Defendants, their affiliates, representatives, agents, contractors, employees, and any associated individuals or entities immediately disengage and cease all communication, contact, social engineering, manipulation, influence campaigns, interference, or harmful actions targeting or involving members of the Tetlin community, shareholders, tribal officials, witnesses, and individuals affiliated with the Tetlin Native Corporation and Native Village of Tetlin.

Furthermore, Plaintiff explicitly requests this Protective Order explicitly prohibit the aforementioned individuals and entities from entering, accessing, occupying, or coming within a defined proximity of Tetlin lands, facilities, properties, and the community at large. Violations of this Protective Order shall explicitly be subject to immediate enforcement measures by federal and local law enforcement, explicitly including the

56

Alaska State Troopers, and carry immediate legal action and penalties to ensure comprehensive protection of community safety, security, integrity, and well-being. Plaintiff further requests that this Protective Order explicitly prohibit any online or digital harassment, impersonation, surveillance, or targeted misinformation campaigns directed at members of the Tetlin community or individuals involved in this litigation. This includes, but is not limited to, social media attacks, distribution of false or manipulated information, use of third-party "front" organizations to sway public opinion, or tampering with communications or election-related efforts.

Any coordinated attempts to interfere with tribal elections, intimidate witnesses, discredit community leaders, or exploit digital tools to destabilize Tetlin's governance shall be treated as a violation of this Protective Order and subject to immediate federal enforcement. Plaintiff also requests explicit protection for all digital systems, community platforms, and AI-based documentation tools used in the litigation or public education process, recognizing their emerging role in community coordination and transparency. Plaintiff further requests that this Protective Order prohibit the use of media outlets, public-facing communications, sponsored publications, community events, or social platforms as tools for coordinated misinformation, intimidation, or manipulation related to the litigation or Tetlin governance.

Defendants, their agents, contractors, and affiliates shall be barred from publishing or distributing misleading statements, promotional materials, or editorials designed to undermine tribal unity, mislead shareholders, or discredit Plaintiff, the Tetlin Native Corporation, or this legal proceeding.

57

The Court is respectfully asked to treat such tactics—including coordinated "community outreach" campaigns designed to obscure facts—as violations of this Protective Order, subject to immediate legal review and enforcement. The integrity of tribal communication, election processes, and community information must be preserved free from distortion or coercion.

22. Plaintiff further explicitly requests the Court order the immediate and transparent turnover and disclosure of all documents, communications, records, digital information, audio/video recordings, evidence, and materials relating to Defendants' interactions, engagements, and activities involving community members, explicitly directing that such evidence be forwarded immediately to impartial investigative authorities, specifically including the **Federal Bureau of Investigation (FBI).** Plaintiff explicitly requests this relief to safeguard community integrity, prevent further exploitation, manipulation, or harm, and to support ongoing impartial federal investigations into Defendants' conduct and activities.

23. **Recognition of Cultural, Historical, and Subsistence Rights:** Plaintiff explicitly requests the Court to formally recognize and affirm the historical, cultural, and subsistence rights and connections of the Tetlin community to the lands in question, explicitly emphasizing the fundamental importance of protecting Tetlin's rightful ownership, traditional land use, cultural heritage, and environmental integrity from further harm or unauthorized exploitation.

24. **Disgorgement and Accounting of Profits:** Plaintiff explicitly requests disgorgement of all profits, proceeds, and revenues explicitly obtained by Defendants through

58

unauthorized mining operations, leasing, subleasing, and any other commercial activities conducted on Tetlin lands without lawful consent. Plaintiff explicitly requests the Court to order a detailed and transparent accounting process to identify, quantify, and secure all such unjustly obtained profits and proceeds, explicitly payable into a constructive trust for the exclusive benefit and restitution of the Tetlin Native Corporation and its shareholders, and the tribe as a whole.

25. **Any Further Relief Deemed Just and Proper:** An award of such other and further relief as the Court deems just, equitable, and proper, including an award of Plaintiff's court costs and any other relief necessary to fully do justice in this matter.

26. **Prohibition and Injunction Against Use of Tetlin-Derived Funds for Litigation Defense:** Plaintiff explicitly requests the Court issue an order prohibiting Defendants, their agents, subsidiaries, affiliates, contractors, or representatives from using any funds, revenues, profits, royalties, resources, or grants explicitly obtained, earned, derived, or secured directly or indirectly from Tetlin lands or activities involving Tetlin lands for their defense or legal representation in this litigation or any related matters. Plaintiff further explicitly requests that this prohibition remain in full force and effect throughout the duration of this litigation until all issues raised herein are fully and completely resolved by the Court. All such funds must explicitly be preserved exclusively for potential restitution, community compensation, or other relief as determined by the Court, explicitly safeguarding the interests of Tetlin Village, including the Tetlin Native Corporation and its shareholders.

59

27. **Comprehensive Disclosure and Turnover of Evidence, Records, and Data:**

Plaintiff explicitly requests immediate, comprehensive, transparent, and unrestricted disclosure and turnover of all scientific, geological, environmental, cultural, legal, financial, operational, transactional, or any other information, data, reports, studies, records, communications, contractual documents, audits, and documentation explicitly collected, developed, obtained, or related to Defendants' activities on Tetlin lands. Plaintiff explicitly emphasizes the necessity of this disclosure to accurately evaluate damages, ecological impact, cultural harm, financial restitution, and legal accountability due to the Tetlin community. All such information shall be clearly and transparently provided immediately upon the Court's order, explicitly without restriction.

28. **Temporary Injunction Preserving Exclusive Litigation Rights:** Plaintiff explicitly requests the Court issue a temporary protective injunction preventing any other individuals, entities, or third parties—aside from Plaintiff, Tetlin Native Corporation, and the Native Village of Tetlin—from initiating, pursuing, or maintaining any lawsuits, legal claims, or actions for damages against the named Defendants or their affiliates, subsidiaries, agents, contractors, or representatives, relating directly or indirectly to the matters, resource extraction, or activities described explicitly within this litigation, until the Court fully and finally resolves all issues presented in this Complaint. This injunction explicitly aims to preserve the rights of Plaintiff, Tetlin Native Corporation, and the Native Village of Tetlin to subsequently pursue appropriate claims, actions, and lawsuits for restitution, compensation, and substantial economic damages clearly arising from Defendants' activities.

60

29. **Explicit Reservation of Right to Amend Complaint:**

Plaintiff explicitly reserves the right, consistent with Federal Rules of Civil Procedure Rule 15(a), to amend this Complaint clearly and explicitly as discovery proceeds, additional information becomes available, new claims or parties are identified, or to more precisely articulate existing claims to ensure full and fair adjudication of the issues explicitly before the Court.

30. **Nationwide Asset Preservation and Disclosure (Contango ORE and Affiliates):**

Plaintiff respectfully requests that the Court compel full disclosure and preservation of all corporate, financial, physical, and mineral assets held by Contango ORE, Inc. and all affiliated entities, projects, and subsidiaries operating across the United States, particularly those enriched through revenue originating from Tetlin's unlawfully exploited lands.

**a)** Plaintiff's Demand for Full Disclosure, Preservation, and Judicial Oversight of All Contango ORE Holdings, Operations, and Revenue Derived from the Tetlin Project – Nationwide Scope

**b)** Plaintiff respectfully requests the Court issue an order compelling Contango ORE, Inc. and all associated entities, including its subsidiaries, joint ventures, parent companies, affiliated contractors, licensees, or financial agents, to:

**c)** Disclose, preserve, and freeze all assets, operations, bank accounts, mineral claims, investments, equipment, infrastructure, intellectual property, transportation vehicles, extracted inventory, and capital proceeds held in any U.S. state or territory, to the extent

61

that those assets were obtained, funded, or expanded through the unauthorized

exploitation of Tetlin lands, unauthorized leases, or proceeds derived therefrom;

**d)** Provide a comprehensive accounting of all revenues generated from the Manh Choh / Tetlin project since 2008, including the downstream reinvestment or redistribution of those revenues into other domestic operations, properties, or corporate holdings.

**e)** Identify and produce all documents regarding acquisitions, capital expansion, intercompany transfers, mergers, or stock distributions executed from 2008 to the present, where Tetlin-originated income was used in whole or part as collateral, justification, or seed capital.

**f)** Disclose and preserve any out-of-state mine sites, joint ventures, R&D facilities, holding companies, financial vehicles, or resource claims funded in whole or in part by revenue, equity sales, or royalties traceable to the Tetlin project;

**g)** Prevent the sale, transfer, restructuring, or encumbrance of any corporate division, asset class, or business unit owned by Contango or its subsidiaries until full discovery and forensic tracing is completed.

**h)** Provide a detailed corporate structure map, including all domestic and international entities with shared officers, ownership, banking institutions, or operational control.

**i)** Submit complete audited financials from 2008 to the present, including ledgers and reports from any entity shown to benefit from Tetlin-based mining activities.

**j)** Disclose any state or federal economic development credits, infrastructure subsidies, or tax benefits received in connection with projects funded or justified by Tetlin-based assets or output projections.

62

l) Plaintiff respectfully asks the Court to issue an immediate preliminary injunction and asset preservation order applicable nationwide, enjoining all covered entities from engaging in transactions that could impair the Court's ability to deliver equitable relief. Such measures are necessary to prevent dissipation, concealment, or laundering of tribal-derived assets and to preserve the integrity of restitution proceedings.

31) **Request for Independent Environmental Assessment and Coordination with Federal Oversight:**

Plaintiff respectfully requests that the Court authorize and coordinate an **independent environmental study and impact assessment** of Tetlin lands affected by the Manh Choh mining project, to be conducted by a third-party environmental consulting entity with no financial ties to any Defendant. Given that Tetlin River flows through the **federally managed Tetlin National Wildlife Refuge**, and that downstream tributaries such as the **Tok and Tanana Rivers connect into the federally regulated Yukon River**, Plaintiff requests that this environmental review be undertaken in consultation with the **U.S. Environmental Protection Agency (EPA)**, **U.S. Fish & Wildlife Service**, and the **U.S. Army Corps of Engineers**. This study is essential to identify any existing or ongoing harm to the watershed and ecological health of the region. To ensure integrity, independence, and long-term enforcement of any remediation or restoration recommendations, Plaintiff seeks that the Court order appropriate funding and logistical support for such a review, consistent with federal standards and environmental protection responsibilities.

32) **Court-Authorized Infrastructure, Tools, and Field Equipment for Long-Term Support (With Community Ownership Transfer):**

Plaintiff respectfully requests that the Court authorize the procurement or funding of essential infrastructure, vehicles, field equipment, and logistical tools necessary for the successful implementation of this Court's orders in the Native Village of Tetlin.

Due to the complete absence of housing, roads, clean water access, or internet connectivity in the affected region, Plaintiff requests:

- A modular housing structure suitable for year-round residence and administration.
- All-terrain vehicles (e.g., snowmachine, side-by-side, or 4-wheeler) for field monitoring.
- A small watercraft boat to access remote lake and river areas.
- Water filtration systems and rain catchment for clean drinking and sanitation
- Furniture and supplies to establish a mobile working office and overnight shelter
- Satellite internet, mobile radios, and communications infrastructure
- Solar or hybrid power systems for sustainable operations
- Drones, waterproof cameras, and GPS tools to document and analyze environmental conditions (including water runoff, tailings pond seepage, or acid-generating discharge)
- Aerial survey capability, including helicopter overflight, fixed-wing reconnaissance, or comparable aviation support to document and map surface damage not only at the primary mine site, but also at satellite extraction camps and operational zones established across remote parts of Tetlin. These camps, including mountain and upland zones, remain largely undocumented and inaccessible by ground. Plaintiff requests photographic, video, and geotagged mapping support for environmental damage documentation, long-term land use planning, and evidentiary recordkeeping.

64

- represent foundational infrastructure for ensuring community protection, regulatory compliance, environmental accountability, and lawful stewardship of the reclaimed lands

- **Authorization of Equipment, Infrastructure, and Sustained Operational Resources** Plaintiff respectfully requests that the Court authorize the procurement, staging, and use of **all equipment, shelter, transportation tools, and operational infrastructure** reasonably necessary to support Plaintiff's duties as Tribal Asset Recovery Coordinator. This includes any assets required for **field access, environmental assessment, site reclamation, logistical transport, snow and land clearing, and the protection of impounded resources**.

- Plaintiff further requests that the Court recognize **food, fuel, maintenance supplies, and other subsistence costs** directly related to sustained field operations as valid, court-authorized expenses to be funded or reimbursed through recovered or frozen assets.

- All assets provided—whether temporary or permanent, mobile or fixed—shall remain under court supervision and be used exclusively to support environmental restoration, asset recovery, and infrastructure stabilization. Upon conclusion of litigation, **all such equipment, structures, and improvements shall be transferred to the Tetlin Native Village** to support ongoing community rebuilding and environmental stewardship.

**Personal Safety & Secured Shelter for Field Implementation**

Due to documented threats, intimidation, and the history of retaliatory conduct associated with resource conflicts in remote Indigenous communities, Plaintiff respectfully requests that the Court authorize and facilitate provision of permanent, secured housing and related field

65

infrastructure. This shelter is essential to safely carry out court-ordered land restoration, infrastructure recovery, and governance transition activities under extreme rural conditions. Plaintiff shall be accompanied by his dependent daughter, who is cognitively impaired and requires stability, warmth, and proximity to care. The region offers no housing, no emergency services, and no tribal support. Plaintiff therefore requests that the shelter include winterized accommodations with a locking structure, safe fuel and generator storage, clean water capability, and integrated communications. All keys, access devices, and operational control over this field housing shall remain with Plaintiff (in his role as Tribal Asset Recovery Coordinator), supervised by the Court or its appointed receiver.

This request is not for comfort, but for **operational readiness, safety, and survival** in a region destabilized by unlawful land takings and power consolidation. Permanent placement of such housing shall be made for future tribal use after litigation concludes.


All such equipment, materials, and improvements shall remain under the permanent ownership of Tetlin Native Village or a duly designated community governance entity upon conclusion of litigation or reassignment of Court-appointed duties.

These resources shall not be for personal use or enrichment, but instead represent foundational infrastructure for ensuring community protection, regulatory compliance, environmental accountability, and lawful stewardship of the reclaimed lands.


Kevin Gunter, submit this statement in my capacity as a tribal member of the Native Village of Tetlin and as the Plaintiff in this matter. I respectfully ask the Court to recognize the

unique and overwhelming responsibilities that will fall on plantiff after litigation—

responsibilities no one else is equipped or willing to take on.

The Tetlin community today is without functioning governance, without proper corporate

management, and without access to the basic tools of justice, education, and self-

determination. Its people have lost not only their land, but their voice, their vote, their

resources, and their trust in leadership.

I am currently the only individual in a position to write their grants, organize and train future

leaders, manage tribal records, restore shareholder voting rights, respond to federal and state

compliance requirements, and rebuild both a tribal government and a functioning ANCSA

corporation.

There are no homes. No internet. No road-accessible government building. The village has

no infrastructure capable of supporting this work.

I respectfully request that the Court authorize the provision of essential equipment,

transitional shelter, and operational tools so I can return to Tetlin not as an individual—but as

a **living extension of the Court's remedy.**

Everything provided—housing, transportation, communications, documentation tools—shall

be permanently retained by the Tetlin Native Village or its lawful successor for future

community use. I seek no ownership. Only capacity.

I do not do this for personal gain. I do this because someone must.

And because, as a tribal member, I am bound—by heritage, by duty, and by heart—to protect

the land, the people, and the legacy of Tetlin.

To ensure that our way of life is not erased. To ensure that what was stolen is restored.

And to ensure that the voices of those who still remain are not forgotten.

67

also respectfully notify the Court that I will be accompanied in Tetlin by my dependent daughter, who is cognitively impaired and requires ongoing care and stability. The infrastructure and equipment requested here are essential not only to carry out the Court's orders—but to do so while safely caring for her, in a region with no support systems or public services.

These conditions further reinforce the need for durable, winterized housing and all listed logistical support—not for comfort, but for legal compliance, field stability, and the human dignity of those still standing after all others have walked away.

## IX. Violations of U.S. Treaties, Federal Statutes, and International Agreements:

Plaintiff explicitly alleges that Defendants' conduct and unauthorized transactions have violated not only ANCSA but also explicit treaty obligations, federal statutes, executive orders, and international agreements recognized or endorsed by the United States.

### A. Violation of the Treaty of Cession (Alaska Purchase Treaty of 1867)

The **Treaty of Cession between Russia and the United States (1867)** explicitly stipulated protection for the rights of Alaska's indigenous inhabitants, explicitly stating that the indigenous population "shall remain undisturbed in their rights and possessions." Defendants' unauthorized land transfers, illegal mining activities, and continued interference have explicitly disturbed the Tetlin people's rights and possessions, violating this fundamental treaty obligation.

### B. Violation of the Indian Reorganization Act (IRA, 1934)

68

The Tetlin Native Community explicitly adopted its tribal constitution under the IRA in 1940, explicitly guaranteeing self-governance, democratic representation, and procedural integrity. Defendants' unauthorized governance changes in 2019, disenfranchising Tetlin members, and bypassing legitimate community consent explicitly violate the fundamental principles and protections explicitly afforded under the IRA.

**C. Violation of the Indian Civil Rights Act (ICRA, 1968)**

The Indian Civil Rights Act explicitly guarantees fundamental civil rights, including due process and equal protection, to tribal members. Defendants have explicitly violated these rights through unauthorized governance actions, suppression of dissent, disenfranchisement, and denial of fair process and community consent in the critical decisions regarding Tetlin's lands and governance.

**D. Violation of the Indian Self-Determination and Education Assistance Act (ISDEAA, 1975)**

ISDEAA explicitly protects the rights of indigenous communities to self-governance and explicitly prohibits external entities from interfering with internal governance or decision-making processes. Defendants' unauthorized governance actions, corporate interference, and coercive transactions explicitly violate ISDEAA by undermining Tetlin's fundamental right to self-determination.

**E. Violation of Executive Order 5365 (1930) – Establishment of Tetlin Indian Reserve**

President Herbert Hoover's Executive Order 5365 explicitly established the Tetlin Indian Reserve in 1930 to explicitly protect Tetlin's ancestral territory and subsistence resources. Defendants'

69

**Trial Request**

Plaintiff, recognizing the complexity of the issues and the equitable nature of much of the relief sought, **waives his right to a trial by jury** to the extent permitted and appropriate. Plaintiff requests that this case be tried to the Court in a **bench trial**. Given the detailed history of land transactions, corporate dealings, and the need for extensive equitable remedies (quiet title, injunctions, trust accounting, etc.), Plaintiff believes that a trial before the Court will be more efficient and better suited to resolve the factual and legal issues. A bench trial will allow the Court to make nuanced findings and craft tailored relief for the multifaceted issues presented, in a manner that a jury may find difficult to manage. Plaintiff will be prepared to present all evidence and argument to the Court and is confident that a bench trial is in the best interest of justice for this case.

Dated: __10/30__, 2025.

Respectfully submitted,

**Kevin Gunter** (Plaintiff, pro se, and on behalf of the Ad Hoc Committee of Tetlin Tribal Members, and disenfranchised shareholders of the Tetlin Native Corporation)

70